HOWARD WEAVER *v.* AMERICAN OIL CO. AND HOMER HOFFER.

[No. 1271S350. Filed December 3, 1971. Rehearing denied January 20, 1972.]

*Byron C. Kennedy, Herbert H. Bent,* of Warsaw, for appellant.

*Arthur A. May, Crumpacker, May, Levy & Searer,* of South Bend, for appellees.

ARTERBURN, C. J.—In this case the appellee oil company presented to the appellant-defendant leasee, a filling station operator, a printed form contract as a lease to be signed by the defendant, which contained, in addition to the normal leasing provisions, a "hold harmless" clause which provided in substance that the leasee operator would hold harmless and also indemnify the oil company for any negligence of the oil company occurring on the leased premises. The litigation arises as a result of the oil company's own employee spraying gasoline over Weaver and his assistant and causing them to be burned and injured on the leased premises. This action was initiated by American Oil and Hoffer (Appellees) for a declaratory judgment to determine the liability of appellant Weaver, under the clause in the lease. The trial court entered judgment holding Weaver liable under the lease.

Clause three [3] of the lease reads as follows:

*"Lessor, its agents and employees shall not be liable for any loss, damage, injuries, or other casualty of whatsoever kind or by whomsoever caused to the person or property of anyone (including Lessee) on or off the premises, arising out of or resulting from Lessee's use, possession or operation there-*

*of, or from defects in the premises whether apparent or hidden, or from the installation existence, use, maintenance, condition, repair, alteration, removal or replacement of any equipment thereon, whether due in whole or in part to negligent acts or omissions of Lessor, its agents or employees; and Lessee for himself, his heirs, executors, administrators, successors and assigns, hereby agrees to indemnify and hold Lessor, its agents and employees, harmless from and against all claims, demands, liabilities, suits or actions (including all reasonable expenses and attorneys' fees incurred by or imposed on the Lessor in connection therewith) for such loss, damage, injury or other casualty. Lessee also agrees to pay all reasonable expenses and attorneys' fees incurred by Lessor in the event that Lessee shall default under the provisions of this paragraph."*

It will be noted that this lease clause not only exculpated the lessor oil company from its liability for its negligence, but also compelled Weaver to indemnify them for any damages or loss incurred as a result of its negligence. The Appellate Court held the exculpatory clause invalid, but the indemnifying clause valid. In our opinion, both these provisions must be read together since one may be used to effectuate the result obtained through the other. We find no ground for any distinction and we therefore grant the petition to transfer the appeal to this court.

This is a contract which was submitted (already in printed form) to a party with lesser bargaining power. As in this case, it may contain unconscionable or unknown provisions which are in fine print. Such is the case now before the court.

The facts reveal that Weaver had left high school after one and a half years and spent his time, prior to leasing the service station, working at various skilled and unskilled labor oriented jobs. He was not one who should be expected to know the law or understand the meaning of technical terms. The ceremonious activity of signing the lease consisted of nothing more than the agent of American Oil placing the lease in front of Mr. Weaver and saying "sign", which Mr. Weaver did. There is nothing in the record to indicate that Weaver read the lease; that the agent asked Weaver to read it; or

that the agent, in any manner, attempted to call Weaver's attention to the "hold harmless" clause in the lease. Each year following, the procedure was the same. A salesman, from American Oil, would bring the lease to Weaver, at the station, and Weaver would sign it. The evidence showed that Weaver had never read the lease prior to signing and that the clauses in the lease were never explained to him in a manner from which he could grasp their legal significance. The leases were prepared by the attorneys of American Oil Company, for the American Oil Company, and the agents of the American Oil Company never attempted to explain the conditions of the lease nor did they advise Weaver that he should consult legal counsel, before signing the lease. The superior bargaining power of American Oil is patently obvious and the significance of Weaver's signature upon the legal document amounted to nothing more than a mere formality to Weaver for the substantial protection of American Oil.

Had this case involved the sale of goods it would have been termed an "unconscionable contract" under sec. 2-302 of the Uniform Commercial Code as found in *Burns Ind. Stat.* sec. 19-2-302. The statute reads as follows:

> "*19-2-302. Unconscionable contract or clause.—If the court as a matter of law find the contract or any clause of the contract to have been unconcisonable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.*
>
> *(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination. (Acts 1963, ch. 317, sec. 2-302, p. 539)*"

According to the Comment to Official Text, the basic test of unconscionability is whether, in light of the general commercial background and the commercial needs of the particular

trade or case, the clauses involved are so one-side as to be unconscionable under the circumstances existing at the time of the making of the contract. Subsection two makes it clear that it is proper for the court to hear evidence upon these questions.

> "An 'unconscionable contract' has been defined to be such as no sensible man not under delusion, duress or in distress would make, and such as no honest and fair man would accept. There exists here an 'inequality so strong, gross and manifest, that it is impossible to state it to a man of common sense without producing an exclamation of the inequality of it.' 'Where the inadequacy of the price is so great that the mind revolts at it, the court will lay hold on the slightest circumstances of oppression or advantage to rescind the contract."
>
> "It is not the policy of the law to restrict business dealings or to relieve a party of his own mistakes of judgment but where one party has taken advantage of another's necessities and distress to obtain an unfair advantage over him, and the latter, owing to his condition, has encumbered himself with heavy liability or an onerous obligation for the sake of a small or inadequate present gain there will be relief granted." Stiefler v. McCullough (1933), 97 Ind. App. 123, 174 N. E. 823.

The facts of this case reveal that in exchange for a contract which, if the clause in question is enforceable, may cost Mr. Weaver potentially thousands of dollars in damages for negligence of which he was not the cause, Weaver must operate the service station seven days a week for long hours, at a total yearly income of $5,000-$6,000. The evidence also reveals that *the clause was in fine print* and *contained no title heading* which would have identified it as an indemnity clause. It seems a deplorable abuse of justice to hold a man of poor education, to a contract prepared by the attorneys of American Oil, for the benefit of American Oil which was presented to Weaver on a "take it or leave it basis".

Justice Frankfurter of the United States Supreme Court spoke on the question of inequality of bargaining power in his dissenting opinion in *United States* v. *Bethlehem Steel Corp.*

(1942), 315 U. S. 289, 326, 62 S. Ct. 581, 599, 86 L. Ed. 855, 876.

> *"(I)t is said that familiar principles would be outraged if Bethlehem were denied recovery on these contracts. But is there any principle which is more familiar or more firmly embedded in the history of Anglo-American law than the basic doctrine that the courts will not permit themselves to be used as instruments of inequity and injustice? Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has unconscionably taken advantage of the necessities of the other?"*
>
> *"These principles are not foreign to the law of contracts. Fraud and physical duress are not the only grounds upon which courts refuse to enforce contracts. The law is not so primitive that it sanctions every injustice except brute force and downright fraud. More specifically, the courts generally refuse to lend themselves to the enforcement of a 'bargain' in which one party has unjustly taken advantage of the economic necessities of the other . . .' "*

The traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality. In such a society there is no danger that freedom of contract will be a threat to the social order as a whole. But in present-day commercial life the standardized mass contract has appeared. It is used primarily by enterprises with strong bargaining power and position. The weaker party, in need of the good or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses.

Judge Frankfurter's dissent was written nearly twenty years ago. It represents a direction and philosophy which the law, at that time was taking and is now compelled to accept in our modern society over the old principle known as the *parol evidence rule.* The parole evidence rule states that an

agreement or contract, signed by the parties, is *conclusively presumed* to represent an integration or meeting of the minds of the parties. This is an archaic rule from the old common law. The objectivity of the rule has as its only merit its simplicity of application which is far outweighed by its failure in many cases to represent the actual agreement, particularly where a printed form prepared by one party contains hidden clauses unknown to the other party is submitted and signed. The law should seek the truth or the subjective understanding of the parties in this more enlightened age. The burden should be on the party submitting such "a package" in printed form to show that the other party had knowledge of any unusual or unconscionable terms contained therein. The principle should be the same as that applicable to implied warranties, namely, that a package of goods sold to a purchaser is fit for the purposes intended and contains no harmful materials other than that represented. Caveat lessee is no more the current law than caveat emptor. Only in this way can justice be served and the true meaning of freedom of contract preserved. The analogy is rational. We have previously pointed out a similar situation in the Uniform Commercial Code, which prohibits unconscionable contract clauses in sales agreements.

When a party can show that the contract, which is sought to be enforced, was in fact an unconscionable one, due to a prodigious amount of bargaining power on behalf of the stronger party, which is used to the stronger party's advantage and is unknown to the lesser party, causing a great hardship and risk on the lesser party, the contract provision, or the contract as a whole, if the provision is not separable, should not be enforceable on the grounds that the provision is contrary to public policy. The party seeking to enforce such a contract has the burden of showing that the provisions were explained to the other party and *came to his knowledge* and there was in fact *a real and voluntary meeting of the minds and not merely an objective meeting.*

Unjust contract provisions have been found unenforceable,

in the past, on the grounds of being contrary to public policy, where a party has a greater superior bargaining position. In *Penn. Railroad Co.* v. *Kent* (1964), 136 Ind. App. 551, 198 N. E. 2d 615, Judge Hunter, speaking for the court said that although the proposition that "parties may enter into such contractual arrangements as they may desire may be conceded in the general sense; yet when such special agreement may result in affecting the public interest and thereby contravene public policy, the abrogation of the rules governing common carriers must be zealously guarded against."

We do not mean to say or infer that parties may not make contracts exculpating one of his negligence and providing for indemnification, but it must be done *knowingly* and *willingly* as in insurance contracts made for that very purpose.

It is the duty of the courts to administer justice and that role is not performed, in this case, by enforcing a written instrument, not really an agreement of the parties as shown by the evidence here, although signed by the parties. The parol evidence rule must yield to the equities of the case. The appeal is transferred to this court and the judgment of the trial court is reversed with direction to enter judgment for the appellant.

Givan, DeBruler, Hunter, JJ., concur; Prentice, J., dissents, with opinion.

## DISSENTING OPINION

PRENTICE, J.—My opinion is diametrically opposed to those of both the majority herein and of the Appellate Court as set forth in 261 N. E. 2d 99, and 262 N. E. 2d 663. There is no law to support the decisions of the Appellate Court and, since I contend there are no facts to support the majority opinion of this Court, it, therefore, is necessary to burden this record by setting forth not only the special findings of fact of the trial court but also to add, arguendo, the additional findings

that the defendant (appellant) contends were either admitted or proved.

The facts, as found specially by the trial court were as follows:

"1. That the plaintiff, American Oil Company, is a corporation organized and existing under and by virtue of the laws of the State of Maryland and is licensed and authorized to do business within the State of Indiana and was so licensed and authorized to do business within the State of Indiana on the 5th day of September, 1961 to and including the 27th day of April, 1962.

2. That Homer Hoffer was on the 27th day of April, 1962, an agent and employee of American Oil Company.

3. That the defendant, Howard Weaver, was on the 5th day of September, 1961, an adult over the age of 21 years and was able to read and write and had been operating a filling station since 1956.

4. That on or about the 5th day of September, 1961, the plaintiff, American Oil Company, and the defendant, Howard Weaver, did enter into a certain written lease which is attached to the plaintiffs' complaint and designated as 'Exhibit A', for the lease of a certain filling station and equipment known as lots number 346 and 347 as shown on the recorded plat of Beiger Farm, 5th Addition to the City of Mishawaka, St. Joseph County, State of Indiana, commonly known and described as 2000 Lincolnway East, Mishawaka, Indiana; and that under the terms of said lease the plaintiff, American Oil Company was the lessor and the defendant, Howard Weaver, the lessee of said above described premises and equipment and that there was contained in said lease the following numerical paragraph 3:

'Lessor, its agents and employees shall not be liable for any loss, damage, injuries, or other casualty of whatsoever kind or by whomsoever caused, to the person or property of anyone (including lessee) on or off the premises, arising out of or resulting from Lessee's use, possession or operation thereof, or from defects in the premises whether apparent or hidden, or from the installation, existence, use, maintenance, condition, repair, alteration, removal or replacement of any equipment thereon, whether due in whole or in part to negligent acts or omissions of Lessor, its agents or employees; and Lessee for himself, his heirs, executors, administrators, successors and assigns, hereby agrees to indemnify and hold Lessor, its

agents and employees, harmless from and against all claims, demands, liabilities, suits or actions (including all reasonable expenses and attorneys' fees incurred by or imposed on the Lessor in connection therewith) for such loss, damage, injury or other casualty, Lessee also agrees to pay all reasonable expenses and attorneys' fees incurred by Lessor in the event that Lessee shall default under the provisions of this paragraph.'

5. That on or about the 27th day of April, 1962 said lease, including numerical paragraph 3 as quoted in finding number 4 above, between American Oil Company and Howard Weaver was in full force and effect and was a valid enforceable lease and contract by and between the parties.

6. That on or about the 27th day of April, 1962 the plaintiff, Homer Hoffer, as the agent, servant and employee of the plaintiff, American Oil Company, went on the premises which was the subject matter of said lease between American Oil Company and Howard Weaver for the purpose of repairing certain gasoline pumps located thereon and that during the repair of said gasoline pumps and the demonstration thereof gasoline was sprayed over and about the person of the defendant, Howard Weaver, and his employee, Donald Miller, causing each of them to be burned and to suffer certain personal injuries.

7. That claims for damages and personal injuries have been made against the plaintiffs, American Oil Company and Homer Hoffer, and lawsuits filed for the collection of such damages in the St. Joseph Circuit Court, known as Howard J. Weaver vs. Homer Hoffer and American Oil Company, known as Cause No. C-1864, and in the St. Joseph Superior Court, known as Donald Miller vs. Homer Hoffer and American Oil Company, known as Cause No. C-1955. That said complaints seek the recovery of damages for personal injuries allegedly suffered and sustained by Donald Miller and the defendant herein, Howard Weaver, by reason of alleged negligence of the plaintiffs herein, American Oil Company and Homer Hoffer.

8. That the plaintiffs have tendered to the defendant, Howard Weaver, herein the defense of each of said above described lawsuits and have demanded that Howard Weaver hold the plaintiffs, American Oil Company and its agent, servant and employee, Homer Hoffer, harmless against said claims and lawsuits and have also demanded that Howard Weaver assume the defense of American Oil Company and Homer Hoffer in said lawsuits and claims pursuant to numerical paragraph 3 of said lease which was in full force

and effect on the 27th day of April, 1962, the date of the alleged incident which resulted in the injuries to Howard Weaver and Donald Miller and is the subject matter of said pending lawsuits.

9. That the defendant, Howard Weaver, has refused to hold the plaintiffs, American Oil Company and Homer Hoffer, harmless from said claims or assume the defense of American Oil Company and Homer Hoffer in the lawsuits brought against them.

10. That an actual existing justifiable controversy exists between the parties hereto having adverse legal interests which controversy is as follows:

a. The plaintiffs claim that by virtue of the terms contained in said written lease entered into by and between the parties on the 5th day of September, 1961 which was in full force and effect on or about the 27th day of April, 1962 which said written lease is designated as Exhibit A. attached to the plaintiffs' complaint and which was offered and introduced into evidence as plaintiffs' Exhibit 1, and in particular numerical paragraph 3 thereof, the defendant, Howard Weaver, is obligated to undertake the defense of the plaintiffs and to hold the plaintiffs harmless from any and all expenses, costs of suit, legal fees, damages, judgments and to reimburse the plaintiffs for the defense costs heretofore incurred as a result of the defendant's refusal to assume the defense of the plaintiffs in the following claims and lawsuits presently pending:

Howard J. Weaver vs. Homer Hoffer and American Oil Company, known as Cause No. C-1864, St. Joseph Circuit Court.

Donald Miller vs. Homer Hoffer and American Oil Company, known as Cause No. C-1955, St. Joseph Superior Court,

and to reimburse said plaintiffs for any payments, expenses, costs, including but not limited to attorneys' fees, which may have been incurred or paid as a result of said claims and pending lawsuits.

b. The defendant, Howard Weaver, claims that he is not obligated to defend the plaintiffs in said causes of actions or to represent the plaintiffs in said actions or to hold the plaintiffs harmless from any and all judgments, costs of suit, legal fees, damages, judgments or any other claims or awards which may be obtained in any said pending actions or to reimburse the plaintiffs for the defense costs heretofore incurred by reason of the terms of the written

lease which is attached to the plaintiffs' complain and designated as Exhibit A which has been admitted into evidence in this cause designated as plaintiffs' Exhibit 1.

11. That there is an actual existing controversy between the parties hereto which will result in protracted litigation unless resolved and determined by this Court in this action by the construction of the legal terms, duties and obligations of the parties hereto pursuant to the terms and obligations of said written lease and in particular numerical paragraph 3 thereof."

The facts assumed arguendo are the following:

"A. That on or about the 1st day of August, 1956, the defendant Howard Weaver, as lessee, entered into a written lease with plaintiff American Oil Company, as lessor, under the terms of which lease the said Weaver leased a certain filling station and certain equipment from said defendant for a period of one year, said filling station and equipment being located at 2000 Lincolnway East in the City of Mishawaka, Indiana, said premises being legally described as lots numbered 346 and 347 as shown on the recorded plat of Beiger Farm, Fifth Addition, to the City of Mishawaka, St. Joseph County, State of Indiana.

B. That on or about August 1, 1959, the date the term of said lease referred to above expired, the said lease was renewed by the parties for a period of one year; that on or about August 1, 1960, said lease was again renewed for a term of one year; that on September 5, 1961, said lease was again renewed by lessor and lessee for a period of one year, the term of said lease commencing August 1, 1961, and expiring July 31, 1962; that the original lease dated on or about August 1, 1958, and each renewal lease, including the lease dated September 5, 1961, were identical except for the term thereof.

C. That each lease entered into by and between the plaintiff American Oil Company and the defendant Howard Weaver as above set forth was on a printed lease form furnished and prepared by the plaintiff.

D. That the said premises leased by plaintiff American Oil Company to said Weaver consist of two lots, upon which is located a building, containing a service room for servicing motor vehicles and a sales room for the use of lessee Weaver in the conduct of the business of selling lessor's products and for the display of said products; the area of land not covered by said building is paved; that three gasoline pumps are

located on said paved portion of the leased permises, which pumps, when manually activated electrically pump gasoline from underground storage tanks into customers motor vehicles, the said underground storage tanks have a storage capacity of five thousand gallons of gasoline; that the exterior of said building is of a distinctive red, white and blue color design and is the trademark of all filling stations owned or leased by plaintiff American Oil Company; that the word 'Standard' in large letters is part of the exterior of said building; that a large 'Standard' sign is on said premises, which sign can be electrically illuminated at night; that the gasoline pump and other equipment contain emblems and other names indicating the same connected with plaintiff American Oil Company or its parent Standard Oil Company.

E.   That the main equipment used in the operation of said filling station, including the building, the hydraulic lift and greasing and lubricating equipment, the lighting equipment, the Standard Oil Company signs, the air compressor, the gasoline pumps, except the nozzles on the hoses, and the underground storage tanks, are all owned by plaintiff and are included in the lease as a part of the leased premises.

F.   That plaintiff American Oil Company is a wholly owned subsidiary of Standard Oil Company of Indiana, and is Standard's operating company, marketing Standard Oil Company products in all states except Alaska and Hawaii through over twenty-five thousand company owned or leased retail outlets, said outlets being commonly known as filling stations; that gasoline and related products for the automotive trade are marketed by plaintiff through said outlets to millions of consumers daily, said customers consisting in the main of operators of motor vehicles who drive their said vehicles upon the premises known as filling stations to have said vehicles serviced and filled with gasoline and petroleum products; that the plaintiff American Oil Company along with its parent company Standard Oil Company of Indiana, is one of the largest refiners and distributors of petroleum products in the world.

G.   That said lease agreement, by clause number 2 hereof, requires the lessee Howard Weaver to keep the equipment, machinery and appliances in good order and repair; that notwithstanding said clause number 2, after the execution of the said lease dated August 1, 1956, and to and including the 27th day of April, 1962, the plaintiff American Oil Company assumed the obligation and burden of keeping

the said equipment, machinery and appliances in good order and repair at American Oil Company's own expense.

H.  That during the entire adult life of defendant Howard Weaver, up to and including the date the first lease between the plaintiff and defendant Weaver was executed on or about the 1st day of August, 1956, Howard Weaver had been a laboring man, working at manual labor as an employee of others; that during said time he had had no business experience in managing or operating his own business, nor had to had education or experience in examining or interpretating lease agreements; that the defendant Howard Weaver's formal education consists of his completing nine grades of public school.

I.  That when defendant Howard Weaver and plaintiff American Oil Company entered into the said lease dated August 1, 1956, he was handed the printed lease agreement by an agent of plaintiff American Oil Company who requested Weaver to sign the same, which Weaver did. Weaver did not read the lease, nor was he requested to read it by plaintiff American Oil Company, nor did said plaintiff point out to defendant Weaver that clause number 3 of said lease contained a so-called 'save harmless' provision, and this same procedure was followed as each subsequent lease was executed by said parties. That defendant Howard Weaver did not have actual knowledge of the contents of clause 3 of said lease until after he was injured on April 27, 1962.

J.  That defendant Howard Weaver's annual net income from the operation of the said leased filling station from 1956 to and including 1961 was between $5,500.00 and $6,500.00.

K.  That the indemnity provisions of clause number 3 of said lease agreement imposed upon defendant Howard Weaver a potential liability far greater than, and completely out of proportion to, the benefit flowing to said defendant from said lease agreement.

L.  That the operation and maintenance of a filling station, and the maintenance of thousands of gallons of gasoline in underground storage tanks, and the pumping of said gasoline from said storage tanks through mechanical pumps from below the ground to above the ground for the use of consumers, involves risk and danger to the general public.

M.  That clause number 2 of said lease required defendant Howard Weaver to keep the machinery, equipment and

appliances, located on said leased premises, in good order and repair at Weaver's own expense."

Upon the foregoing, the trial court stated conclusions of law and rendered judgment for the plaintiffs (appellees). The conclusions, in substance, were that the law was with the plaintiffs and that the exculpatory and indemnifying provisions of the lease between the plaintiff and defendant, American, were enforceable against the defendant.

The decisions of the Appellate Court would not enforce the exculpatory agreement upon the theory that, although this Court has consistently refused to void exculpatory provisions as contrary to public policy, their burdens being unusual and considerable, they should not be enforced unless it appears that the party who assumes the burden under the clause was aware of it and understood its far reaching implications. The burden of proving such awareness, or lack of it, would vary depending upon the relative bargaining positions of the parties. The indemnity provision, however, was held enforceable, by reason of the availability of insurance rendering the risk manageable.

The facts as found, are that although the defendant never read the lease, he had ample opportunity to do so and to obtain counsel. A general rule in effect not only in Indiana but elsewhere, is that a person who signs a contract, without bothering to read the same, will be bound by its terms. *Welsh* v. *Kelly-Springfield Tire Co.* (1938), 213 Ind. 188, 12 N. E. 2d 254; *Walb Construction Co.* v. *Chipman* (1931), 202 Ind. 434, 175 N. E. 132; *Givan* v. *Masterson* (1898), 152 Ind. 127, 51 N. E. 237; *Keller* v. *Orr* (1886), 106 Ind. 406, 7 N. E. 195.

Without regard to whether or not he was aware of its contents, a person will be relieved of his obligations under a contract under circumstances falling into two main categories: (1) where the contract is not enforceable because of occurrences or omissions (fraud, concealment, etc.) surrounding its execution and where (2) the contract is not enforceable because of the nature or subject of the contract (illegality of

subject matter). The Appellate Court would have us recognize a third category and excuse performance, at least as to harsh provisions, without a showing that he was aware of and understood the contract provisions and their implications, with the burden of proof upon such issues to vary depending upon the relative bargaining positions of the parties. The objective of such a rule is laudable, but I think it, nevertheless, totally unworkable.

The identical clause which Defendant here seeks to avoid was held not to be against public policy in the case of *Loper* v. *Standard Oil Co.* (1965), 138 Ind. App. 84, 211 N. E. 2d 797. Defendant directs our attention, however, to *Henningsen, et al.* v. *Bloomfield Motors, Inc., et al.* (1960), 32 N. J. 358, 161 A. 2d 69, 75 A. L. R. 2d 1, cited in Am. Jur. 2d *Contract,* § 188, where, according to Defendant, it is said: "It has been held that clauses limiting liability are given rigid scrutiny by the courts, and will not be enforced unless the limitation is fairly and honestly negotiated and understandingly entered into." The Appellate Court has accepted this statement at face value although there appears to be no Indiana authority in support of such rule. It has been given limited application in other jurisdictions and, as limited, appears to be reasonable and workable. But the defendant appears to mislead us by failing to complete the quotation, which is completed as follows: "* * * this is especially true where the contract involves services of a public or semi-public nature, but has also been applied in some controversies involving private contracts, particularly where, as in the case of a public or semi-public contract *the private contract is the only means one of the parties has of filling an important need.*" (Emphasis added). The *Henningsen* case involved an action by a consumer against the vendor of an automobile, wherein the court declined to enforce the provision of the sales contract that provided that the express warranty was in lieu of all others expressed or implied. The case has no application to the issues raised on this appeal. Neither do the facts as found by the trial court, together with

additional facts mentioned, suggest a disparity of bargaining positions warranting the application of exceptions to reasonable and well established rules or offend against my concept of fair business negotiations. A general disparity of economic or intellectual positions, while factors to be considered along with others in such cases, do not, in and of themselves, give one who is dominant in such attributes an unconscionable advantage in the particular transaction. Whether or not the contract was "understandingly entered into" by Defendant, we, of course, cannot say; but we see nothing to indicate that he was deprived of the opportunity to understand it by any acts or omissions of American. It would be a strange, and in my opinion impossible, rule if one party to a contract were to be held the guardian of the other and accountable to him for both the advantages he hoped to gain thereunder and the risks or losses that he may have failed to consider. Under such a rule, the less one knew of the provisions of the written contract which he executed, the better would be his position in the event of later dissatisfaction.

Chief Justice Arterburn, speaking for a majority of this Court, has concluded that the defendant was in an inferior position with respect to the lease and treats the lease as we might treat an *adhesion* contract. I find justification for neither. An adhesion contract is one that has been drafted unilaterally by the dominant party and then presented on a "take it or leave it" basis to the weaker party, who has no real opportunity to bargain about its terms. (Restatement 2d, Conflict of Law § 322 a, Comment e) (C.J.S. *Contracts* § 10, p. 581). Here we have a printed form contract prepared by American. There was great disparity between the economic positions of American and Defendant, and Defendant was a man of limited educational and business background. However, there is nothing from which we can find or infer that the printed lease provisions were not subject to negotiation or that, with respect to this particular lease, Defendant was not

in a bargaining position equal to that of American. The fact that Defendant did not avail himself of the opportunity to read the agreement but elected to accept it as presented does not warrant the inference that his only options were to "take it or leave it." That the "hold harmless" clause was or might have been in small print, as suggested by the majority, can hardly have significance in light of the claim and finding that the defendant did not read any portion of the document.

The majority places great reliance upon the dissenting opinion of Justice Frankfurter in *U. S.* v. *Bethlehem Steel Corp.* (1942), 315 U. S. 289, 326, 62 S. Ct. 581, 599, 86 L. Ed 855, 876. I agree that it is a well reason opinion and that the philosophy there expressed has had a great impact upon the parole evidence rule and rightfully so. However, I find no similarity between the actual situations under consideration. In the *Bethlehem Steel* case, the national security of the United States hung in the balance while the terms of the contract in question were negotiated. Although the negotiators for the government had a theoretical choice between accepting the proposed contract or taking over the operation of Bethlehem, the latter subjected the nation to such grave peril as to amount to no choice at all. Bethlehems' actions clearly amounted to the taking of an unconscionable advantage of the circumstances, and there was ample authority for relieving the government of the harsh terms thusly coerced. The court there had merely to apply the fundamental principles of law that the courts will not enforce a bargain where one party has unconscionably taken advantage of the necessities and distress of the other. In the case at bar, the defendant was under no compulsion to act. There is nothing to indicate that he was motivated by any purpose other than to improve his own economic position, that the lease arrangement was to be more beneficial to American than to him, that he was financially, intellectually or emotionally incompetent or disadvantaged, that his necessities or potential distress were in any way involved or that

his bargaining position with respect to this particular transaction, was not substantially equal to that of American.

The case of the *Pennsylvania Railroad Co.* v. *Kent* (1964), 136 Ind. App. 551, 198 N. E. 2d 615, has no application, as it was determined upon an issue of public interest and the rules governing common carriers. Also, it is clear that the uniform commercial code sections on sales cited by the majority can have no application; and Chief Justice Arterburn was careful to point out that it was referred to only to illustrate the acceptance of legal philosophies permitting and fostering fair dealings and substantive justice rather than blind and often unjust adherence to hard and fast rules. But we have neither the duty nor the right to abandon established principles whenever, in our judgment, it is necessary to avert a hardship. And should the Legislature see fit to vest us with either or both, I question that we have the requisite wisdom. It is for this reason, I believe, that our mandate is not simply to administer justice but to do so *under the law*. I hold no special interest in preserving the policy of enforcing indemnity and exculpatory contracts. It may well be that they should be greatly curtailed. But the majority opinion does not hold. Defendant's dilemma does not spring from an unconscionable advantage taken of him either by deceit of American or by virtue of a superior bargaining position. It clearly stems from either an unwillingness or indifference upon his part to utilize the resources available to him or from a willingness to assume the risks in exchange for the rewards that he hoped to gain. Presumably he has had the benefits contracted for, and the majority decision is a grant of retrospective unilateral contractual immunity to the careless and speculative and places a premium upon ignorance. I fear that it will stand as an invitation to any litigant who, finding himself burdened by his own contract, will say that he did not understand its provisions and ask us for relief that we have neither the duty, right nor wisdom to grant.

I would accept transfer of this cause, set aside the decision

of the Appellate Court, as modified, and affirm the decision of the trial court.

NOTE.—Reported in 276 N. E. 2d 144.