May, Judge;
[1] For many years, the Indiana State Fair Commission (“the Commission”) used equipment ■ leased from Mid-America Sound (“Mid-America”) to produce outdoor concerts, including one on August 31, 2011, where a number of people were killed or injured when ;a stage at the Indiana State Fair collapsed. Lawsuits followed, and Mid-America asserted cross-claims or third-party claims seeking indemnification from the Commission. The Commission moved for summary judgment on the question whether it must indemnify Mid-America, arguing the indemnity provisions in their agreements. were unconscionable; violated the Indiana Tort Claims Act, Ind.Co.de ch. ,34-13-3; could not be applied retroactively; and were outside the Commission’s authority. The trial court granted the Commission’s motion but did not articulate the basis for its decision. As the Tort Claims Act does not apply and there are genuine issues of fact regarding the validity and enforceability of the indemnification agreement, we reverse and remand for trial.
Facts and Procedural History[1]
[2] Mid-America provides temporary roof structures and other equipment used to produce concerts and entertainment events. The Commission operates the Indiana State Fair, and 'its executive director is Cindy Hoye. Since the mid-1990s, the Commission' has "leased equipment from Mid-America to produce concerts at the Grandstand Stage and other locations at the fairgrounds.
[3] During the last ten years of their business relationship, the Commission and Mid-America followed a standard procedure. Mid-America delivered the leased equipment to the Commission before the Fair. After the Fair, Mid-America picked up the equipment, .signed about forty contracts for the rented items, and submitted *336 the contracts to the Commission. The Commission audited each contract to ensure it reflected.the parties’ agreement, then paid Mid-America.
[4] Before 2003, the invoices Mid-America submitted did not include an indemnification provision, but that year the parties began using a form lease contract, which they continued to use for the next nine years. It did include indemnification provisions. During that period the parties executed over one hundred leases.
[5] Each lease consisted of a double-sided invoice and a single-sided claim voucher. The front side of the invoices identified the .leased goods and the payment due. It included the delivery and return dates for the goods and the “class” of rental-in this case,' “show.” (App. at 541.) On the back, the invoices included “Conditions of Contract” in two sections of the document. In the “Rentals” section, the Commission agreed “to assume the entire responsibility for the defense of, and to pay, indemnify, and hold [Mid-America] harmless from and hereby releases [Mid-America] from any and all claims for damage to property or bodily injury (including loss of life) resulting from” the use of Mid-America’s equipment. (Id at 542.) In the “Shows” section of the same “Conditions of Contract,” the Commission again agreed to “pay, indemnify, and hold harmless [Mid-America] from and hereby releases [Mid-America] from any and all claims for damage to property or bodily injury” resulting from the use of the equipment. (Id.) The Commission reviewed and paid each invoice.
[6] The claim vouchers that accompanied the invoices were drafted by the Commission and the Commission directed Mid-America to use them. Over the signature line for “State Fair Official” the claim voucher included the language: “I certify that the attached invoice is true and correct ... and was in accordance with the contract.” (Id. at 544.) The “standard protocol,” (id. at 492), was that the claim voucher had to be executed by two officials — it was certified by a State Fair official as true and correct and in accordance with the contract, then it was approved by the executive director of the Commission.
[7] In 2009 the Commission hired a contracts officer, who worked to adopt a “sole source,” (id. at 473), agreement that would allow the Commission to accept equipment and services from Mid-America without requiring the Commission to engage in a bidding process. In 2011, the Commission asked Mid-America to send a letter explaining the services Mid-America would provide in 2011. The Commission asked that the letter refer to the long-term working relationship between the Commission and Mid-America, and to indicate Mid-America’s “satisfaction with how business has been done with [the Commission] ... regarding payments, invoices, etc.” (Id' at 475.) Mid-America did so, and the letter referred to the parties’ prior course of dealing. The letter noted Mid-America had always provided the Commission with lower-than-normal pricing for production services, and it was able to do so because it worked so well with the Commission’s Events Services Manager, who “understands our billing and the timing and manner in which .invoices are paid.” (Id at 481.) Because of that “long term relationship,” (id.), Mid-America could maintain expenses at the same level or limit any increase.
[8] Also in 2011, the Commission sent Mid-America its “Standard Terms and Conditions that it provided in all contracts.” (Br. of Appellee Indiana State Fair Commission (hereinafter Commission’s Br.) at 5.) That document included language that Mid-America would agree to indemnify and hold harmless the Commis *337 sion, but the Commission would not provide such indemnification to Mid-America. The Commission does not direct us to. anything in the record indicating the parties ever entered into any agreement including those standard terms and conditions, and the record evidence is that Mid-America did not receive that document.
[9] The Commission hired Mid-America to provide equipment for the 2011 State Fair, where strong winds blew the temporary roof structure and audio equipment to the ground. After the 2011 Fair, Mid-America submitted to the Commission documents and invoices that included the same defense and indemnity provisions that had been in the lease agreements in prior years. The Fair’s Director of Events signed the vouchers, certifying each was “true and correct” and “in accordance with the contract.” (E.g., App. at 525.) Then Hoye, the Commission’s Executive Director, reviewed and executed the contracts, giving them “special scrutiny” because of the stage collapse. (Id. at 503.)[2] The Commission’s Chief Financial Officer audited Mid-America’s invoice for the temporary roof structure, which included the defense and indemnity provisions, certifying it was true and correct and in accordance with the. contract.
[10] When various plaintiffs commenced lawsuits against Mid-America and others, Mid-America asked the Commission to defend and indemnify it, but the Commission refused. Mid-America then filed third-party claims and cross-claims against the Commission. The Commission moved for and was granted summary judgment.
Discussion and Decision
[11] ' We review summary judgment de riovo, applying the same standard as the trial court. Hughley v. State, 15 N.E.3d 1000, 1003 (Ind.2014). Drawing all reasonable inferences in favor of the non-moving party, we will find summary judgment appropriate if the designated evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is . required to resolve the parties’ differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences. Id.
[12] The initial burden is on the summary-judgment movant to demonstrate there is no genuine issue of fact as to a determinative issue, at which point the burden shifts to the non-movant to come forward with evidence showing there is an issue for the trier of fáct. Id. While the non-moving party has the burden on appeal of persuading us a summary judgment was erroneous, we carefully assess the trial court’s decision to ensure the non-movant was not improperly denied his day in court. Id.
[13] Our summary judgment policies aim to protect a parfy’s day' in court. Id. While federal practice permits the moving party to merely show that the party carrying the burden of proof lacks evidence on a necessary element, we impose a more onerous burden — to affirmatively negate an opponent’s claim. Id. That permits summary judgment to “be precluded by as little as a. non-movant’s ‘mere designation *338 of a self-serving affidavit,’ ” Id. (quoting Deuitch v. Fleming, 746 N.E.2d 993, 1000 (Ind.Ct.App.2001), trans. denied). Summary judgment is not a summary trial, and it is not appropriate just because the non-movant appears unlikely to prevail at trial. Id. at 1003-04. We “consciously err[ ] on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims.” Id. at 1004.
[14] No public policy prevents parties from contracting as they desire, and in Indiana, a party may contract to indemnify another for the other’s own negligence. GKN Co. v. Starnes Trucking, Inc., 798 N.E.2d 548, 552 (Ind.Ct.App.2003). However, such provisions are strictly construed and will not be held to provide indemnification unless it is so stated in clear and unequivocal terms. Id. We disfavor indemnification clauses because to obligate one party for the negligence of another is a harsh burden, that a party would not lightly accept. Id.

Unconscionability and Enforceability

a. Retroactive Application

[15] The Commission asserts indemnity agreements cannot be retroactively applied, citing Henthorne v. Legacy Healthcare, Inc., 764 N.E.2d 751, 759 (Ind.Ct.App.2002) (“the date of the negligent act causing injury is the date for deciding when an indemnitee should be held responsible to defend or indemnify after a demand or claim is made”). And see Am. States Ins. Co. v. Williams, 151 Ind.App. 99, 105, 278 N.E.2d 295, 300 (1972) (when indemnity is the subject of an express contract, Indiana takes the broad view that parties.may lawfully bind themselves to indemnify against future acts of negligence). The Commission characterizes the indemnity provision in- the case before us as retroactive because the indemnity provisions were printed on an invoice, and the invoice was not provided to the Commission until after Mid-America had rendered its services and after the stage collapse. However, the Commission reviewed and signed the invoices Mid-America submitted-after the state collapse, and it paid Mid-America.
[16] The designated evidence of the parties’ course of dealing[3] gives rise to a genuine issue whether the application of the indemnity provision may fairly be characterized as “retroactive,” and summary judgment therefore could not properly be granted on that ground. Before the stage collapse, the Commission agreed to continue the parties’ longstanding course of dealing, which had for years included indemnity terms on invoices not submitted until after the Fair. That agreement before the stage collapse, was confirmed by “the Commission’s certifications after the Fair,” (Reply Br. of Appellant (hereinafter Mid-America’s Reply Br.) at 3), in the form of its audits of the invoices, its execution of them, and its certifications that the invoices were true and correct and in accordance with the contract.
*339 [17] We find instructive S. Ry. Co. v. Arlen Realty & Dev. Corp., 220 Va. 291, 257 S.E.2d 841, 845 (1979). Arlen argued it was not bound by.an indemnification agreement because it was not executed until after Southern’s employee was injured. The trial court had found that “on many occasions for the .convenience of all parties,” the agreements in.question were signed after the equipment had been picked up and returned.. Id. “It was the habit and practice of [the parties] to conduct their business in this manner and was a course of conduct and business practice that both parties, by their past dealings, had approved.” Id.
[18] The Virginia Supreme Court held the finding that the parties, by their course of dealings, had assented to and adopted the terms of the printed form as their agreement “is fully supported by the uncontradicted evidence showing that the same forms were employed in hundreds of transactions between.the parties over a period of several years preceding [employee’s] injury.” Id. Similarly, Mid-America and the Commission agreed before the Fair that they would continue their long-term working relationship, which had included more than one hundred certifications by the Commission that invoices containing the same indemnity provisions as those at issue here were “in accordance with the contract.” {E.g., App. at • 544.) Summary judgment could not properly be granted on the ground the agreements were retroactive.

b. Placement of Indemnity Provision

[19] The -Commission next argues the indemnity provisions were unconscionable. The Commission characterizes the indemnification provision- as something Mid-America “slipped in” in 2008, (Commission’s Br. at 3), and as being “tucked into the middle of small boilerplate print on the back of the invoice,” {id. at 4). We cannot find, as a matter of law, this indemnification provision was unconscionable. The indemnification provision is in the same size type as everything else on the “Conditions of Contract” page, (e.g., App. at 542), and in the “Rentals” section it has a heading in bold type that says “5. Responsibility for Use — Indemnity.” (Id.) (emphasis in original).
[20] The Commission relies on Maxon Corp. v. Tyler Pipe Indus., Inc., 497 N.E.2d 570, 577 (Ind.Ct.App.1986), reh’g denied, trans. denied, where we said “[w]hen ... the imposition of a broad indemnification clause is' attempted without the express assent of the proposed indem-nitor, and when that clause is placed in relative obscurity on the back of an invoice, it is unconscionable.” Even though “there- may have been no disparity in the bargaining positions of Tyier and Maxon,” we said that “[fjmposhjg such a clause upon a disadvantaged party who knows not what he signs and guilefully imposing it upon a party through the unilateral use of an invoice at or after the time the product is delivered” was unconscionable. Id. at 578.
[21] Maxon does not control. We note initially that the unconscionability discussion in' Maxon was dictum; we determined the indemnity provision ainounted to a “material'alteration” and therefore never became part of the contract between Tyler and Maxon: “[b]eeause the indemnification clause in the invoice was, as a matter of law, a material alteration, it did not, as a matter of law, become a part of the contract.” Id. at 575.
[22] Maxon is also factually distinguishable. There, as here, the indemnity provision was on the back of an invoice. But in Maxon the provision “BY ACCEPTANCE OF THE GOODS, BUYER AGREES TO. INDEMNIFY SELLER AGAINST ALL- LIABILITY, LOSS, *340 COST AND EXPENSE ARISING OUT OF ANY CLAIM OF ANY NATURE” was inserted deep in a lengthy passage with the heading “WARNING AND COVENANTS.” Id. at 572 (emphasis in original). Mid-America’s “Reptáis” indemnity provision was included under the heading “Responsibility for Use — Indemnity.” (App. at 779.) In the “Shows” section, it was included under “Operation of Equipment.” (Id)
[23] "In Maxon, the parties had exchanged similar forms in the past, but there were no, facts indicating a Tyler employee had previously read an identical invoice. Id. at 575-76. Here, by contrast, the record indicated a long course of dealing, which included the use for many years of invoices containing the indemnity provisions, and the Commission’s review and approval of over a hundred similar invoices. We acknowledge evidence the Commission’s director did not read the invoices, but the Commission had a statutory obligation with regard to its payments:
The' fiscal officer of a governmental entity may not draw a warrant or check for payment of a claim unless ... the invoice or bill is approved by the officer or person receiving the goods and services ... the invoice or bill is , filed with the governmental entity’s fiscal- , officer; [and] the,fiscal officer audits and certifies before payment that the invoice or bill is true and correct.
Ind.Code § 5-11-10-1.6 (emphasis added). There was evidence of such review and certification of the many invoice? the Commission paid to Mid-America. To the extent summary judgment for the Commission was premised on unconscionability, it was error.

c. The Commission’s Agreement to the Provision

[24] Nor was the Commission entitled to summary judgment on the ground it “did not knowingly and willingly agree to indemnification.” (Commission’s Br.' at 14.) - In light of the ample evidence it reviewed, audited, approved, and paid the invoice at issue, and numerous similar invoices over the years; summary judgment on the ground the Commission was unwilling to agree tó indemnification or did not know it was doing so was error:
[25] Parties may "contract for indemnification, but it must be done knowingly and willingly. Weaver v. Am. Oil Co., 257 Ind. 458, 465, 276 N.E.2d 144, 148 (1971). The Commission characterizes Weaver as holding where “a printed form prepared by one party contains hidden clauses unknown to the other party, the burden is on the party submitting the printed form to show that the other party had knowledge of the terms contained in the form.” (Commission’s Br. at 15.) The Commission asserts Mid-America therefore was required to show it explained the indemnity-" provisions to the Commission. Under the‘facts‘of this case, we decline to hold Mid-America had any such obligation.
[26] Weaver does say “[t]he party seeking to enforce such .a contract has the burden of showing that the provisions were explained to the other party and came to his knowledge and there was in fact a real and voluntaxy meeting of the minds and not merely an objective meeting.'’ 257 Ind. at 464, 276 N.E.2d at 148. But the Commission does not acknowledge the language, that precedes that statement:
When a party can show that the contract, which is sought to be enforced, was in fact an unconscionable one, due to a prodigious amount of bargaining power on behalf of the stronger party, which is used to the stronger party’s advantage and is unknown to the lesser party, causing a great hardship and risk *341 on the lesser party, the contract provision, or the contract as a whole, if the provision is not separable, should not be enforceable on the grounds that the provision is contrary to public policy.
Id. at 464, 276 N.E.2d at 148 (emphasis added). As it appears both parties before us were sophisticated and held relatively equal bargaining power, Weaver does not control. At the very least, there are factual issues whether the State Fair Commission was, in this transaction, a “lesser party” over which Mid-America wielded “a prodigious amount of bargaining power.”
[27] Finally, the Commission asserts it did not knowingly and willingly agree to indemnify Mid-America because 1) the invoice in question was not signed, and 2) the “Sole Source” letter does not reflect an indemnification agreement.
[28] As for the fact the invoice was not signed, the Commission offers no authority to the effect that alone invalidates any agreement the parties had, nor does it explicitly so argue. It does, however, argue its signature on the Commission’s internal claim voucher authorizing payment for the invoice does not create an indemnity contract because it does not indicate the Commission assented to the indemnification terms on the invoice itself. As there was ample evidence from which an inference of the Commission’s assent could be drawn, summary judgment on that ground was error.
[29] The Commission appears to argue it signed the claim voucher only because it was required to by statute, see Ind.Code § 5-11-10-1.6 (fiscal officer of a governmental entity may not draw a warrant or check for payment of a claim unless the invoice or bill is approved by the officer or person receiving the goods and services), and its signature did not mean it agreed to the boilerplate indemnity language on the invoice. But the language on the claim vouchers reflected exactly that agreement. The claim vouchers did more than just authorize payment — they explicitly established the invoices were in- accordance with the contract, and were true and correct. And as noted above, the “Sole Source” letter memorializes the parties’ prior course of dealing, which included over a hundred identical indemnification agreements. To the extent summary judgment for the Commission was based on the premise it was not aware of or did not willingly assent to the indemnification provision, it was error.

Whether the Terms of the Invoice Require Indemnification

[30] The Commission argues Mid-America has no right to indemnification even according to the terms of the contract, pointing to evidence the use of Mid-America’s load bearing roof was not for a “rental” but was instead for a “show.” As noted above, the invoice at issue in this case had two sections, “Rentals” and “Shows,” each with an indemnity section. Under the column “class” on the invoice, the word “show” is entered. (App. at 778.)
[31] The “Rental” section of the invoice generally addresses the use of Mid-America’s equipment by the lessee, here the Commission, while the “Shows” section addresses. use of the equipment by Mid-America or under Mid-America’s supervision. Mid-America argues the “rental” section applies because the Commission used Mid-America’s equipment. The “Shows” section independently applies, Mid-America says, because the Commission and the performers’ employees operated the equipment, including the load-bearing roof, but with Mid-America’s authorization, which authorization was premised on the Commission’s agreement not to use the roof in high winds.
*342 [32] The Commission asserts the “Shows” provision cannot apply because “such indemnification applies only to injuries arising from the use of ‘equipment,’ and not to injuries arising from the load-bearing roof.” (Commission’s Br. at 25.) It does not offer a citation to anything in the record to support its apparent premise that the roof was not considered part of the “equipment” the Commission leased from Mid-America. Rather, it notes Mid-America could authorize others to use its equipment, but it asserts “unlike other equipment, Mid-America has ‘absolute control’ of the Load Bearing Roof, and no provision exists allowing Mid-America to transfer control of the Load Bearing Roof to anyone else.”[4] (Id.) (emphasis in original).
[33] As there was evidence the Commission and the performers’ representatives “operated the equipment, including the Load Bearing Roof,” (Mid-America’s Reply Br' at 11), we decline to hold the Commission was entitled to summary judgment on the premise the invoice was for a “show” only[5] and the language in the “Shows” part of the invoice cannot be applied.

The Commission’s Authority to Indemnify

[34] Even if there was a valid indemnity agreement, the Commission argues, it cannot be enforced because the Commission; as a government entity, cannot enter into such an agreement. It relies on the Indiana Tort Claims Act (ITCA) and the Appropriations Clause of the Indiana Constitution.
[35] The ITCA does not apply. Like any statute in derogation of the common law, the ITCÁ must be strictly construed against limitations on a claimant’s right to bring suit. City of Indianapolis v. Busch-man, 988 N.E.2d 791, 794 (Ind.2013). The ITCA “applies only to a claim or suit in tort,” Ind.Code § 34-13-3-1, and this is a dispute over a contract provision, not a tort claim.[6]
[36] The Commission argues the ITCA applies to this contract action because the indemnity clause is in fact “a means of shifting tort liability to Indiana taxpayers,” (Commission’s Br. at 27), and only the legislature “decides the .terms of potential taxpayer exposure to civil damages suits,”[7] The Commission notes the basic *343 purpose of an indemnity clause is to shift from the indemnitee to the indemnitor the financial responsibility to pay damages, citing Mead Johnson & Co. v. Kenco Grp., Inc., 899 N.E.2d 1, 3 (Ind.Ct.App.2009). Still, in that decision we analyzed the dispute over an indemnity clause as a contract action and noted if the words of an indemnity clause are clear and unambiguous,- they are to be given their plain and ordinary meaning. Id. We have held a party “may not restyle a breach-of-con-traet claim as a tort claim simply to obtain additional damages,” JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC, 977 N.E.2d 354, 364 (Ind.Ct.App.2012), and we decline the Commission’s invitation to permit it to restyle this breach-of-contract claim as a tort claim simply to avoid a contractual obligation.
[37] In a decision addressing limitations, the Southern District of Indiana rejected, in Lilly Indus., Inc. v. Health-Chem Corp., 974 F.Supp. 702, 710 (S.D.Ind.1997), reasoning similar to that the Commission offers: “Health-Chem argues briefly that the substance of this [indemnification] count is a claim for damage to real property. However, the source of the duty allegedly breached here was the written contract, and that makes this a claim for breach of a written contract.”
[38] The legislature has explicitly granted the ■ Commission broad authority to enter into contracts: “The commission may ... [e]nter into contracts related to the commission’s powers and duties under this article.” Ind.Code § 15-13-3-4.
It seems to be well settled that the state in all its contracts and dealing must be adjudged and abide by the rules which govern in determining the right of private’ citizens contracting and dealing with each other. There is not one law for the state, and another for its subjects. When the state engages in business and business enterprises, and enters into contracts with individuals,.the rights and obligations of the contracting parties must be adjusted upon the same principles as if both contracting parties were private persons: Both stand upon equality before the law.
State v. Feigel, 204 Ind. 438, 178 N.E. 435, 437 (1931).
[39] The record before us does not reflect the Commission’s enabling statute or its own rules concerning contracts prohibit indemnification agreements, and it is clear the legislature kiiows how. to limit .or proscribe indemnity provisions when jt wants to do so. See, e.g., Ind.Code §.8-2.1-26-5 (prohibiting indemnification agreements in motor, carrier transportation contracts with regulated public utilities), and Ind. Code § 13-23-13-10 (prohibiting indemnification agreements in agreements by owners or operators of underground storage tanks who áre liable to the state for the costs of corrective action).
Conclusion
[40] There are genuine issues of fact regarding the validity and enforceability of the indemnification provisions in the vouchers' Mid-Affierica' submitted to the Commission and the Commission reviewed and paid, arid the Commission is not shielded by the ITCA. Summary judgment for the Commission was therefore error, and we accordingly reverse and remand for trial.
[41] Reversed and remanded.
FRIEDLANDER, J., concurs.
YAIDIK, C.J., dissents with separate opinion.

. We heard oral argument January 12, 2015 at the Statehouse in Indianapolis. We corn-mend counsel on the quality’ of their oral advocacy.

. The Commission asserts in its Statement of Facts that "[the Commission] ... never saw the indemnity provisions on the back of the invoice.” (Commission’s Br. at 7.) The pages of the record to which the Commission directs us in support of that assertion are part of Hoye’s deposition testimony, where she said she did not know the. "conditions of contract even existed.” (App. at 739.) That testimony does mot support the statement that the-.Commission "never saw. the indemnity provisions on the back of the invoice..’-’

. We agree with numerous decisions holding whether there has been a mutual course of dealing is a question of fact. E.g., Wagener v. Steele, 117 Ga. 145, 43 S.E. 403, 404 (1903); and see C9 Ventures v. SVC-W., L.P., 202 Cal.App.4th 1483, 136 Cal.Rptr.3d 550, 562 (2012) (whether there may be an- inference of the parties’- cqmmon knowledge or understanding that is based-upon a prior course of dealing is a question of fact); Olinger v. Sanders, 92 Ind.App. 358, 174 N.E. 513, 515 (1931) (whether a deposit “was a general or special deposit, and what the intention- of the parties really was, is a question of fact for the court or jury trying the case to determine, from all the evidence as to custom, course of dealing, understanding, and circumstances of the particular case under investigation”):

. Mid-America’s control over the roof was not so “absolute” as the Commission characterizes it. The language of the “Shows” provision is that Mid-America had "absolute control” of "height, loading, banners, backdrops, and all actions regarding operation of the roof ... regarding inclement weather." (App. at 779.)

. As summary judgment in this contract dispute was error to the extent it was premised on applicátion of the tort claims act, we need not address whether the Commission was a governmental entity to which the act might .apply. . Nor do we address its argument it has no “authority to agree to excess tort liability." (Commission’s Br. at 36.)

.The Commission also argues at some length that a document it refers to as the “Professional Services Contract Manual,” (Commission’s Br. at 28), prohibits state entities from entering into indemnification agreements. That manual does not appear to be in the record before ps, and a web address to which the State directs us returns this result: “Error-Page Not Found. ■ The Indiana Department of Administration has- made major improvements to our site!”.http://www.in.gov/ai/ errors/idoa_404.html (last visited January 2, ’ 2015). We are therefore unable to address that argument.