# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**MARK R. SMITH**
Smith Fisher Maas & Howard, P.C.
Indianapolis, Indiana
Attorney for West Bend Mutual
Insurance Company

**ANDREW B. JANUTOLO**
**JON C. ABERNATHY**
Goodin Abernathy, LLP
Indianapolis, Indiana
Attorneys for K.B. Electric, LLC

ATTORNEYS FOR APPELLEES:

**JOSEPH M. DIETZ**
**ANDREW M. SUMERFORD**
**RICK D. MEILS**
**WILLIAM M. BERISH**
Meils Thompson Dietz & Berish
Indianapolis, Indiana
Attorneys for MacDougall Pierce
Construction, Inc.

**STEPHEN J. PETERS**
**DAVID I. RUBIN**
Harrison & Moberly, LLP
Indianapolis, Indiana
Attorneys for Amerisure Insurance
Company

**FILED**
Jun 10 2014, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

WEST BEND MUTUAL INSURANCE )
COMPANY and K.B. ELECTRIC, LLC, )
)
Appellants, )
)
vs. )   No. 06A01-1304-CT-162
)
MACDOUGALL PIERCE )
CONSTRUCTION, INC., AMERISURE )
INSURANCE COMPANY, et al., )
)
Appellees.[1] )

APPEAL FROM THE BOONE SUPERIOR COURT
The Honorable Matthew C. Kincaid, Judge
Cause No. 06D01-1101-CT-45

**June 10, 2014**

**OPINION – FOR PUBLICATION[2]**

**KIRSCH, Judge**

---

[1] Because of the number of claims of the various parties, we refer to them as appellants and appellees in the caption with further explanation of their claims and statuses later in this opinion.

[2] We held oral argument in this case on March 12, 2014 in the Indiana Court of Appeals Courtroom in Indianapolis, Indiana. We commend counsel for the quality of their written and oral advocacy.

After he sustained serious injuries through electrocution at the site of a construction project, James Wethington, an employee of K.B. Electric, LLC, filed a lawsuit against various defendants seeking compensation for his injuries. West Bend Mutual Insurance Company and K.B. Electric appeal from the trial court's order, which disposed of motions for summary judgment, and in which the trial court entered a declaratory judgment in favor of Amerisure Insurance Company and against West Bend regarding indemnification clauses and coverage under the available insurance policies. The following restated issues are presented for our review:

I.      Whether the trial court erred by granting summary judgment in favor of Amerisure and MacDougall Pierce Construction Inc., its insured, based upon the following determinations:

>       A.  West Bend had the sole primary duty under its Commercial General Liability ("CGL") policy to defend or indemnify Wal-Mart against Wethington's claims;
>
>       B.  West Bend had the sole primary duty under its CGL policy to defend or indemnify MacDougall against Wethington's claims;
>
>       C.  West Bend's umbrella coverage provided coverage to Wal-Mart and MacDougall with respect to Wethington's claims;
>
>       D.   West Bend's Umbrella Policy was primary to Amerisure's CGL policy for purposes of Wethington's claims against Wal-Mart and MacDougall;
>
>       E.   K.B. Electric had a duty under a Subcontract's indemnification provision to defend or indemnify MacDougall against Wethington's claims; and
>
>       F.  West Bend had a duty under its CGL and umbrella policies to defend or indemnify K.B. Electric against MacDougall's third-party complaint for indemnification.

II.      Whether the trial court's determination on the duty to indemnify was premature;

III.     Whether the Subcontract is an insured contract under the Contractors Businessowners Policy issued by West Bend to provide CGL coverage to K.B. Electric and the Commercial Umbrella Policy issued by West Bend to K.B. Electric; and

IV.     Whether the trial court correctly determined that the anti-subrogation rule applies to West Bend's claims.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On June 26, 2008, Wal-Mart hired MacDougall as the general contractor for the construction of a Wal-Mart SuperCenter in Lebanon, Indiana ("the Project"). K.B. Electric was a subcontractor selected by MacDougall to perform electrical work at the Project. Wethington was employed by K.B. Electric on June 10, 2009, when he was injured at the Project site while working in the scope of his employment. Wethington filed a complaint against various defendants seeking compensation for his injuries, which were catastrophic.

The Prime Contract between Wal-Mart, the owner of the property, and MacDougall consisted of an AIA Document A201-1997 general conditions document, and included supplementary conditions requiring MacDougall to purchase and maintain, until full performance of the contract, "[CGL] insurance . . . with minimum limits of $2,000,000 per occurrence, $3,000,000 general aggregate," "Umbrella/Excess Liability Insurance with minimum limits of $5,000,000," and to name Wal-Mart as an "additional insured," on both policies on a "primary" and "noncontributing" basis. The Supplementary Conditions provided that MacDougall's insurance policies could not

3

exclude coverage for Wal-Mart's independent negligence.

MacDougall entered into a construction subcontract with K.B. Electric for electrical work at the Project. Several of the provisions of the Subcontract are relevant to the issues on appeal and are reproduced here. The Subcontract explicitly refers to the Prime Contract in paragraph 23, a "flow-down" provision, as follows:

> 23. GENERAL CONTRACT:
>
> To the extent of the work to be performed by [K.B. Electric], [K.B. Electric] is bound to [MacDougall] by terms of the contract documents between [MacDougall] and [Wal-Mart] and assumes toward [MacDougall] all the obligations and responsibilities which [MacDougall], by those documents, assumes toward [Wal-Mart] and Architect. All rights of [Wal-Mart] and Architect under the contract documents are preserved with respect to the work to be performed by [K.B. Electric]. The Subcontract consists of (i) this Subcontract Agreement; (ii) the Prime Contract, including the Agreement between [Wal-Mart] and [MacDougall] and all other Contract documents identified therein, including all Conditions of the contract (general, supplementary and special conditions), Drawings, Specifications, Addenda issued prior to execution of the Prime Contract between [Wal-Mart] and [MacDougall], and other Contract Documents listed in the Prime Contract; (iii) other documents identified in this Subcontract Agreement; and (iv) changes or modifications to the Subcontract issued after execution of this Agreement.

*Appellants' App*. at 306. Paragraph 29 of the Subcontract contains the following provision:

> 29. SUBCONTRACT CONTROLS:
>
> Where any provision of the contract documents between [Wal-Mart] and [MacDougall] are found to be inconsistent with any provision of this Subcontract, then this Subcontract shall govern.

*Id*. at 307.

K.B. Electric was required under the terms of the Subcontract to obtain, at its sole expense, and furnish to Wal-Mart and MacDougall, certificates of insurance for CGL "with a combined Bodily Injury and Property Damage limit of not less than ONE Million

4

($1,000,000.00) dollars per occurrence and in the aggregate," and to name Wal-Mart and MacDougall as additional insureds ("AIs") on a primary non-contributory basis. *Id*. at 301. Unlike the Prime Contract, the Subcontract did not include a provision explicitly requiring the purchase of umbrella/excess insurance coverage, and did not include a prohibition against K.B. Electric's insurer from excluding coverage for the independent negligence of Wal-Mart and MacDougall.

The Subcontract contains two indemnification provisions, which are referred to by the parties as Paragraph 4 and Paragraph 21. Those indemnification provisions read as follows:

4. INSURANCE:

INSURANCE/HOLD HARMLESS RIDER

. . . .

HOLD HARMLESS:

To the fullest extent permitted by law, [K.B. Electric] expressly agrees to defend (at [K.B. Electric's] expense and with counsel acceptable to [MacDougall]), Indemnify, and hold harmless [Wal-Mart], [MacDougall], Architect, Architect's Consultants, Engineer, Construction Manager, Lender and any other parties which [MacDougall] has agreed to indemnify as named or referenced in the project contract documents as attached to and made a part of this Subcontract, their respective Officers, Directors, Shareholders, Employees, Agents, Successors, Affiliates and Assigns from and against any and all claims, suits, losses, cause of action, damages, liabilities, fines, penalties and expenses of any kind whatsoever, including without limitation arbitration or court costs and attorney's fees, arising on account of or in connection with injuries to or the death of any person, or any and all damages to property including loss of use, from or in any manner connected with the work performed by or for [K.B. Electric] under this Subcontract, caused in whole or in part by the presence of the person or property or the negligent acts or omissions of [K.B. Electric] or any of its Employees, Agents, Representatives, Sub-Subcontractors, or suppliers or anyone for whose acts they may be liable, including without limitation such claims, damage, loss or expense caused in part by the negligent acts or omissions of a party indemnified hereunder. Such obligation shall not be construed to negate, abridge or reduce the rights or obligations of indemnity

5

which would otherwise exist as to a party or person described in the Paragraph. The defense and indemnification obligations under this Subcontract agreement shall not be restricted in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for [K.B. Electric] under workers' compensation acts, disability benefits acts, or other employees of [K.B. Electric] or of any third party to whom [K.B. Electric] may subcontract a part or all of the work.

. . . .

21. INDEMNITY:

A.  [K.B. Electric] shall unconditionally indemnify, hold harmless, protect and defend [MacDougall], [Wal-Mart], Architect, and all of their agents, and employees from and against all claims, damages, losses, liabilities, and expenses, including attorneys' fees, arising out of or resulting from the performance of [K.B. Electric's] work or of other activities or services of any kind undertaken by [K.B. Electric], or any other actions taken on or off the premises, provided that any such claim, damages, loss liability, or expense, (i) is attributable to bodily injury, sickness, disease, or death of any person (including employees of [K.B. Electric], indemnities, and the third parties), or patent infringement or to injury to or destruction of tangible property and (ii) is caused in whole or in part by any negligent or wrongful act or omission of [K.B. Electric] or anyone directly or indirectly employed by it or anyone for whose acts it may be liable, or is caused by or arises out of the use of any products, material, or equipment furnished by [K.B. Electric].  [K.B. Electric] shall bear any expense, whether incurred or paid by [MacDougall], [Wal-Mart], or the Architect on account of their being charged with such liability for any such death, injury, loss or damage, including attorney's fees and court costs in the defense or preparing for the defense against such claims or charges.  This paragraph shall apply to the claims of [K.B. Electric] and its employees against any other subcontractor and to the claims of any other subcontractor or its employees against [K.B. Electric]. . . .

*Id*. at 301-06.

Wethington's original complaint named Wal-Mart and MacDougall as defendants alleging that the two negligently (1) failed to supervise and take safety precautions at the Project site to prevent Wethington from suffering electrocution, (2) failed to duly warn Wethington of the risk of electrocution because the power was kept on while Wethington pulled wire for an electric service box, (3) failed to shut down the power to prevent

6

Wethington from suffering electrocution, and (4) chose to leave the electricity on while Wethington worked in order to save time on completion of the Project. Wethington's amended complaint alleged that Wal-Mart was vicariously liable for MacDougall and K.B. Electric's conduct, and that Wal-Mart assumed a duty of care to Wethington, among other allegations. As for MacDougall, the amended complaint alleged that MacDougall had contractually assumed a non-delegable duty of care such that it was vicariously liable for K.B. Electric's conduct, among other allegations.

At the time of the accident, MacDougall was the named insured under two policies written by Amerisure. The CGL policy included bodily injury/property damage ("BI/PD") coverage with limits of $1,000,000 per occurrence. The Umbrella Policy included limits of $10,000,000 per occurrence. K.B. Electric was the named insured under two policies written by West Bend. The Contractors Businessowners Policy included CGL BI/PD coverage with limits of $1,000,000 per occurrence. The Commercial Umbrella Policy had coverage limits of $6,000,000 per occurrence.

West Bend tendered a defense to Wal-Mart and MacDougall against Wethington's complaint and amended complaint pursuant to a reservation of rights under its insurance policies and demanded that Amerisure participate in the defense of Wal-Mart and MacDougall against Wethington's claims. Because Amerisure declined to participate in the defense efforts, MacDougall filed a third-party complaint against K.B. Electric and West Bend, and West Bend filed a cross-claim/counterclaim/fourth-party complaint against MacDougall, Wethington, Wal-Mart, K.B. Electric, and Amerisure. West Bend defended K.B. Electric against MacDougall's third-party complaint pursuant to a reservation of rights under its insurance policies. Ultimately, Wethington settled his

7

claims against Wal-Mart for $50,000.

MacDougall, West Bend, and Amerisure filed a stipulation of facts and authenticity of documents with the trial court, and motions for summary judgment were filed by each. The trial court held oral argument on the parties' motions and ultimately issued two orders granting MacDougall's and Amerisure's motions, making the following determinations: (1) West Bend had the sole primary duty under West Bend's CGL policy to defend/indemnify Wal-Mart against Wethington's complaint; (2) West Bend had the sole primary duty under West Bend's CGL policy to defend/indemnify MacDougall against Wethington's complaint; (3) West Bend's Umbrella Policy provided coverage to Wal-Mart and MacDougall against Wethington's complaint; (4) West Bend's Umbrella Policy was primary to Amerisure's CGL policy for purposes of Wethington's suit against Wal-Mart and MacDougall; (5) K.B. Electric had a duty under Paragraph 4 to defend/indemnify MacDougall against Wethington's complaint; and (6) West Bend had a duty under its CGL and Umbrella policies to defend/indemnify K.B. Electric against MacDougall's third-party complaint for indemnification. West Bend and K.B. Electric each filed notices of appeal from the trial court's orders, and the matters were consolidated for purposes of appeal.

## DISCUSSION AND DECISION

*Summary Judgment Standard of Review*

Our standard of review in appeals from summary judgment is well settled and has been stated as follows:

> On appeal from a grant of summary judgment, our standard of review is the same as that of the trial court. We stand in the shoes of the trial court and apply a de novo standard of review. Our review of a summary judgment

8

motion is limited to those materials designated to the trial court. Summary judgment is appropriate only where the designated evidence shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. For summary judgment purposes, a fact is "material" if it bears on the ultimate resolution of relevant issues. We view the pleadings and designated materials in the light most favorable to the non-moving party. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party.

A trial court's grant of summary judgment is clothed with a presumption of validity, and the party who lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. Where a trial court enters specific findings and conclusions, they offer insight into the rationale for the trial court's judgment and facilitate appellate review, but are not binding upon this court. We will affirm upon any theory or basis supported by the designated materials. When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court.

In this case, the parties filed cross-motions for summary judgment. However, the fact that cross-motions for summary judgment were made does not alter our standard of review. Instead, the reviewing court must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law.

*Hammerstone v. Ind. Ins. Co.*, 986 N.E.2d 841, 845 (Ind. Ct. App. 2013) (internal citations and quotations omitted).

In particular, since the parties' arguments involve contract interpretation, our standard of review with respect to contracts has been stated as follows:

In general the construction of a written contract is a question of law for the court, making summary judgment particularly appropriate in contract disputes. Because the interpretation of a contract presents a question of law it is reviewed de novo by this court. When a trial court has entered summary judgment in a contract dispute, implicitly it has determined either that: 1) the contract is not ambiguous or uncertain as a matter of law and the trial court need only apply the terms of the contract; or 2) the contract is ambiguous, but the ambiguity may be resolved without the aid of factual determinations.

*Jenkins v S. Bend Cmty. Sch. Corp.*, 982 N.E.2d 343, 347 (Ind. Ct. App. 2013) (internal citations omitted).

9

More particularly, with respect to insurance contracts the following applies:

> The interpretation of an insurance policy presents a question of law that is appropriate for summary judgment. If the language in the policy is unambiguous then it should be given its plain and ordinary meaning. But, if the language is ambiguous, the policy should be strictly construed against the insurer. Finally, the terms of a contract are not ambiguous merely because controversy exists between the parties concerning the proper interpretation of terms.

*Wicker v. McIntosh*, 938 N.E.2d 25, 28 (Ind. Ct. App. 2010) (internal citations omitted).

Here, however, we are asked to determine the responsibilities of two insurance companies. "When, as here, however, the injured party is not the named insured, the policy is construed from a neutral stance." *Barga v. Ind. Farmers Mut. Ins. Grp., Inc.*, 687 N.E.2d 575, 578 (Ind. Ct. App. 1997) (citing *Ind. Lumbermens Mut. Ins. Co. v. Statesman Ins. Co.*, 260 Ind. 32, 34, 291 N.E.2d 897, 899 (1973)).

*Insurance Policy Language*

Both West Bend's and Amerisure's CGL policies contain the standard ISO CGL BI/PD insuring agreement[3] requiring the insurer to defend an insured against any "suit" seeking damages because of "bodily injury" caused by an "occurrence," and to indemnify an insured against "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies." *Id*. at 432, 570. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at 445, 583.

> CGL insurance policies are designed to protect an insured against certain losses arising out of business operations. Most CGL policies are written on standardized forms developed by an association of domestic property insurers known as the Insurance Services Office ("ISO"). *Hartford Fire*

---

[3] Amerisure's CGL form provides at the bottom of each page "Copyright ISO Properties, Inc., 2006." *Appellants' App*. at 432-48. West Bend's CGL form provides at the bottom of each page "Copyright ISO Properties, Inc., 2006." *Id*. at 570-85.

*Ins. Co. v. California*, 509 U.S. 764, 772, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993). "[These] policies begin with a broad grant of coverage, which is then limited in scope by exclusions. Exceptions to exclusions narrow the scope of the exclusion and, as a consequence, add back coverage. However, it is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not create) the coverage sought." David Dekker, Douglas Green & Stephen Palley, The Expansion of Insurance Coverage for Defective Construction, 28 Constr. Law, Fall 2008, at 19, 20.

*Sheehan Constr. Co., Inc. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 162 (Ind. 2010) (internal footnote omitted), *opinion adhered to as modified on rehearing by Sheehan Constr. Co., Inc. v. Cont'l Cas. Co.,* 938 N.E.2d 685 (Ind. 2010).

## 1. Amerisure's CGL Policy[4]

The Contractors General Liability Extension Endorsement defines "insured" to include "you," which is defined to include the "Named Insured shown in the Declarations," which is MacDougall. *Appellants' App*. at 418, 432, 327 (citations to each term respectively). Amerisure's "other insurance" clause provides as follows:

4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

  This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance

  (1) This insurance is excess over:

  . . . .

---

[4] Because the trial court determined that Amerisure's CGL policy was not implicated, we do not set forth the provisions of Amerisure's Umbrella policy.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

(2)    When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit."  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

*Id*. at 442.

Amerisure's Contractor's Blanket Additional Insured Endorsement provides as follows:

SECTION II-WHO IS AN INSURED is amended to include as an insured any person or organization, called an additional insured in this endorsement:

1.  Whom you are required to add as an additional insured under a written contract or agreement relating to your business; or

2.  Who is named as an additional insured under this policy on a certificate of insurance.

However, the written contract, agreement or certificate of insurance must require additional insured status for a time period during the term of this policy and be executed prior to the "bodily injury" . . . . giving rise to a claim under this policy.

. . . .

The insurance provided to the additional insured is limited as follows:

1.     That person or organization is only an additional insured with respect to liability arising out of:

. . . .

(b)     Your ongoing operations performed for that additional insured, unless the written contract or agreement or the certificate of insurance requires "your work" coverage (or working to the same effect) in which case the coverage provided shall extend to "your work" for that additional insured.

12

. . . .

Any coverage provided in this endorsement is excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent, or on any other basis unless the written contract, agreement or certificate requires that this insurance be primary, in which case this insurance will be primary without contribution from such other insurance available to the additional insured.

*Id*. at 407-08.

## 2. West Bend's CGL Policy

West Bend's CGL Policy contains an Additional Insured-Contractor's Blanket Endorsement which provides as follows:

A.   WHO IS AN INSURED (Section II) is amended to include as an additional insured any person or organization whom you are required to add as an additional insured on this policy under a written contract or written agreement.

The written contract or agreement must be:

1.       Currently in effect or becoming effective during the term of this policy; and

2.       Executed prior to the "bodily injury," "property damage," "personal injury and advertising injury."

B.   The insurance provided to the additional insured is limited as follows:

1.   That person or organization is only an additional insured with respect to liability arising out of:

a.  Your premises;

b.  "Your work" for that additional insured; or

c.   Acts or omissions of the additional insured in connection with the general supervision of "your work."

2.   The Limits of Insurance applicable to the additional insured are those specified in the written contract or written agreement or in the Declarations of this policy, whichever is less.   These Limits of Insurance are inclusive and not in addition to the Limits of Insurance shown in the Declarations.

13

3. Except when required by written contract or written agreement, the coverage provided to the additional insured by this endorsement does not apply to:

. . . .

> b. "Bodily injury" or "property damage" arising out of acts or omissions of the additional insured other than in connection with the general supervision of "your work."

C. As respects the coverage provided under this endorsement, Paragraph 4.b. SECTION IV-COMMERCIAL GENERAL LIABILITY CONDITIONS is amended with the addition of the following:

4. Other insurance

> b. Excess insurance
>
> This insurance is excess over:
>
> Any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis unless a written contract specifically requires that this insurance be either primary or primary and noncontributing. Where required by written contract, we will consider any other insurance maintained by the additional insured for injury or damage covered by this endorsement to be excess and noncontributing with this insurance.
>
> When this insurance is excess, as a condition of coverage, the additional insured shall be obligated to tender the defense and indemnity of every claim or suit to all other insurers that may provide coverage to the additional insured, whether on a contingent, excess or primary basis.

*Id*. at 559-60.

### 3. West Bend's Umbrella Policy

West Bend's Umbrella Policy contains a BI/PD insuring agreement, which in pertinent part reads as follows:

We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the underlying insurance does not provide coverage or the limits of "underlying insurance" have been exhausted . . . .

*Id*. at 628. The Umbrella Policy defines "insured" to include:

3. Any additional insured under any policy of "underlying insurance" will automatically be an insured under this insurance.

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by any "underlying insurance."

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "underlying insurance."

*Id*. at 637.

The Umbrella Policy defines "underlying insurance" as "any policies of insurance listed in the Declarations under the Schedule of 'underlying insurance.'" *Id*. at 644. West Bend's CGL policy is the only CGL policy listed in the schedule of underlying insurance. West Bend's Umbrella Policy contains an "other insurance" clause, which reads as follows:

a. This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition does not apply to insurance specifically written as excess over this Coverage Part.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

*Id*. at 639.

**4. Both West Bend Policies**

Pertinent to the issue of West Bend's duty to defend/indemnify its insured, K.B.

15

Electric, against MacDougall's third-party complaint for indemnification, West Bend contends that its CGL and Umbrella Policies limit application to an "insured" to include, in part, "you" the "Named Insured shown in the Declarations," which is K.B. Electric. *Id*. at 570, 605. Both policies also contain a "contractual liability" exclusion which reads as follows:

> 2. Exclusions
>
> This insurance does not apply to:
>
> . . . .
>
> b. Contractual Liability
>
> "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
>
> (1) That the insured would have in the absence of the contract or agreement; or
>
> (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage," provided:
>
> (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and
>
> (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

*Id*. at 571, 629.

Both West Bend policies include an "employer's liability" exclusion that provides the following:

> g. Employer's Liability

16

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

> (a) Employment by the insured; or

> (b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

*Id*. at 571, 630.[5]

The "insured contract" definitions that appear in West Bend's policies, read as follows:

That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

*Id*. at 582, 641.

*Indemnification*

MacDougall argues that the trial court correctly decided the issue of indemnification and that the resolution of the issue was not premature. West Bend, on the other hand, argues that the trial court's decision was premature because Wethington's claims against MacDougall had not yet been resolved. Assuming for the sake of argument that the duty-to-indemnify issue was ripe, West Bend argues that the trial court

---

[5] West Bend's Umbrella policy has additional language at the end of the exclusion that is not reproduced here.

should have allocated Wethington's claims against MacDougall between the two insurers, with Amerisure having the sole duty to provide coverage for MacDougall regarding Wethington's independent negligence claims, other than negligent supervision, and West Bend having the primary duty to provide coverage for MacDougall against the balance of Wethington's claims. Essentially, West Bend offers its own construction of the Subcontract's indemnification provisions, paragraph 4 and paragraph 21, claiming that the contract is ambiguous because the provisions cannot be harmonized.

Assuming that West Bend has standing to challenge the provisions of the Prime Contract and the Subcontract, in *Weaver v. American Oil Co.*, 261 N.E.2d 99, 102-03 (Ind. Ct. App. 1970), *modified by Weaver v. American Oil Co.*, 262 N.E.2d 663 (Ind. Ct. App. 1970), *superseded by Weaver v. American Oil Co.*, 257 Ind. 458 (1971), a panel of this court explained the distinction between exculpatory clauses and indemnity clauses.

> Exculpatory clauses and indemnity clauses are to be distinguished. An exculpatory clause covers the risk of harm sustained by the exculpator that might be caused by the exculpatee. It acts to deprive the exculpator of his right to recover damages for such harm. That is to say, an exculpatory clause acts to release the exculpatee from liability for any future acts of negligence by the exculpateee [sic] which might result in harm to the exculpator.
>
> On the other hand, an indemnity clause covers the risk of harm sustained by third persons that might be caused by either the indemnitor or the indemnitee and acts to effect a shift of the financial burden for the ultimate payment of damages from the indemnitee to the indemnitor. It will be observed that the clause in question is both an indemnity and exculpatory clause. That is, as to liability to third persons, the clause effects a change in the person who ultimately must pay for damage from the indemnitee (American Oil) to the indemnitor (Weaver) and his insurer, if any, and is in that respect an indemnity clause. However, the clause also deprives the lessee Weaver of his right to recover damages for harm suffered due to negligent acts of lessor American Oil and in that respect is an exculpatory clause. Since the rights here considered are those of the contracting parties and not those of a third party, we are concerned only with the exculpatory

18

aspects of the hold harmless clause, which, if enforceable, deprives Weaver of any right to recover for damages suffered because of negligent acts of American Oil.

An indemnity clause imposes no unusual burden on an indemnitor because of the availability and general use of standard liability insurance policies which afford protection from the risk of liability to third persons. Because an indemnity clause covers the risk of harm sustained by third persons, if the indemnitor carries appropriate liability insurance, damages for the harm suffered due to the negligence of either the indemnitor or the indemnitee are paid by the indemnitor's insurance company. Thus, in the indemnity situation the availability and general use of insurance renders manageable the indemnity risk by treating as a unit the combined risk arising from multiple ventures of this type.

The burden assumed under an exculpatory clause, however, is unusual and considerable. Liability insurance offers no protection to an exculpator because such insurance only affords protection from liability to third persons. Because the exculpator has agreed to release the exculpatee from liability for any of the exculpatee's future acts of negligence, the exculpatee can negligently cause the exculpator severe injury yet avoid his otherwise fixed legal responsibility to compensate the exculpator.

Additionally, we restate the differences between agreements to indemnify and agreements to insure.

Absent prohibitive legislation, no public policy prevents parties from contracting as they desire. *Hagerman* [*Constr. Co. v. Long Elec. Co.*], 741 N.E.2d at 392. For instance, in Indiana, a party may contract to indemnify another for the other's own negligence. *Id*. However, this may only be done if the party knowingly and willingly agrees to such indemnification. *Id*. Such provisions are strictly construed and will not be held to provide indemnification unless it is so stated in clear and unequivocal terms. *Id*. We disfavor indemnification clauses because we are mindful that to obligate one party for the negligence of another is a harsh burden that a party would not lightly accept. *Id*.

This court has followed a two-step analysis to determine whether a party has knowingly and willingly accepted this burden. *Id*. *See also Exide* [*Corp. v. Millwright Riggers, Inc.*], 727 N.E.2d at 480; *Moore Heating & Plumbing, Inc. v. Huber, Hunt & Nichols*, 583 N.E.2d 142, 146 (Ind. Ct. App. 1991). First, the indemnification clause must expressly state in clear and unequivocal terms that negligence is an area of application where the indemnitor (in this case, Starnes) has agreed to indemnify the indemnitee (in this case, GKN). *See Hagerman*, 741 N.E.2d at 392. The second step determines to whom the indemnification clause applies. *Id*. Again, in clear

19

and unequivocal terms, the clause must state that it applies to indemnification of the indemnitee by the indemnitor for the indemnitee's own negligence.

*GKN Co. v. Starnes Trucking, Inc.*, 798 N.E.2d 548, 552 (Ind. Ct. App. 2003).

In contrast, an agreement to insure is an agreement to provide both parties with the benefits of insurance regardless of the cause of the loss (excepting wanton and willful acts). *Indiana Erectors, Inc. v. Trustees of Indiana University*, 686 N.E.2d 878, 880 (Ind. Ct. App. 1997), *reh'g denied*. An agreement to insure differs from an agreement to indemnify in that, with an agreement to insure, the risk of loss is not intended to be shifted to one of the parties, but is instead intended to be shifted to an insurance company. *Id*. Neither party intends to assume a potential liability because both are demonstrating appropriate business foresight in avoiding liability by allocating it to an insurer. *Id*. Therefore, standard rules of contract interpretation apply to insurance agreements, rather than the strict construction given to self-indemnification clauses. *See, e.g., Eli Lilly & Co. v. Home Ins. Co.,* 482 N.E.2d 467, 470 (Ind. 1985) ("Generally, in Indiana, contracts for insurance are subject to the same rules of interpretation as are other contracts."). Consequently, because we examine indemnity provisions and insurance provisions using different levels of scrutiny, our determination that the indemnification provisions in the contracts at issue are invalid does not also automatically void the insurance clauses.

*Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 482 (Ind. Ct. App. 2000).

Here, West Bend contends that because Paragraph 4 requires K.B. Electric to indemnify Wal-Mart and MacDougall for their own acts of negligence, but Paragraph 21 is silent on the point, the two provisions are in conflict, are ambiguous, and that construing the Subcontract against its drafter, MacDougall, Paragraph 21 controls. Therefore, K.B. Electric would not be required to indemnify MacDougall for its own negligence. Paragraph 21 of the Subcontract would not be an insured contract under West Bend's policy, and thus, West Bend and Amerisure would be required to divide the responsibility for providing coverage for Wethington's claims, with West Bend having responsibility for vicarious liability claims only, and Amerisure having responsibility for

20

acts of independent negligence.

In *Dixon v. CertainTeed Corp.,* 944 F. Supp. 1501 (D. Kan. 1996), the court was asked, among other things, to interpret the indemnification provisions of a construction contract with respect to the negligence claims of a construction worker who was injured at a worksite in the course and scope of his employment. The construction contract contained five indemnification clauses, two of which were pertinent to the issues on appeal. The contractor claimed that the two indemnification clauses were in conflict because one required the contractor to indemnify the owner for the owner's acts of negligence and the other provision was silent on the point. The *CertainTeed* court found the indemnification provisions to be unambiguous. "Ambiguity does not arise from total omission. It arises when application of pertinent rules of interpretation to an instrument as a whole fails to make certain which one of two or more meanings is conveyed by the words employed by the parties." 944 F .Supp. at 1506 (quoting *Wood v. Hatcher*, 199 Kan. 238, 242, 428 P.2d 799, 803 (1967)). The court found that the "meaning conveyed by these two unrelated sections of the contract is clear to the court—that the [contractor] was to indemnify [the owner] for its own negligence, so long as the loss was not caused by the sole negligence of [the owner]." *Id*.

The reasoning of the *CertainTeed* court applies here, and we reject West Bend's argument that the inclusion of language in Paragraph 4 and omission of that language in Paragraph 21 creates an ambiguity in the Subcontract such that West Bend is not primarily responsible for providing coverage for Wethington's claims. What is clear from the wording of the Subcontract is that K.B. Electric was required to indemnify Wal-Mart and MacDougall, and that West Bend, as K.B. Electric's insurer, was required to

21

provide coverage if the loss was a covered loss.

Furthermore, MacDougall filed its third-party complaint to enforce the indemnification provisions under Paragraph 4, not Paragraph 21. The scope of Paragraph 21 explicitly states, "This paragraph shall apply to the claims of [K.B. Electric] and its employees against any other subcontractor and to the claims of any other subcontractor or its employees against [K.B. Electric]." *Appellants' App*. at 306. Wal-Mart and MacDougall are not subcontractors subject to the conditions of that paragraph.

We also disagree with West Bend's contention that the trial court's decision on the indemnification issue was premature. West Bend argues that since K.B. Electric was not required by the express terms of the Subcontract to obtain umbrella insurance coverage, Amerisure's CGL policy should come into play first, citing to Indiana's adoption of the horizontal exhaustion rule. *See e.g., Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 493-94 (Ind. Ct. App. 2004) ("pro rata rule . . . applies only with respect to two primary insurance policies with competing 'other insurance' clauses.").

In *Wal-Mart Stores Inc. v. RLI Ins. Co.*, 292 F.3d 583 (8th Cir. 2002), the United States Court of Appeals for the Eighth Circuit considered the issue of the priority of payment where both the supplier and retailer had available primary liability insurance, the supplier had excess insurance, and the supply contract between the two contained an indemnification provision. While addressing the circular litigation issue recognized by Judge Learned Hand in *Maryland Casualty Co. v. Employers Mutual Liability Insurance Co. of Wisconsin*, 208 F.2d 731, 733 (2nd Cir. 1953), the Eight Circuit first examined the "other insurance" provisions of the primary insurance policies, but then concluded that a decision on that basis would lead to circular litigation. Instead, the court held that the

22

outcome of the dispute was controlled by the indemnification agreement. 292 F.3d at 587.

In the process of reaching that determination, the court first examined the relationships between the parties and the validity of the promise to indemnify. Next, the court considered the effect of making a covered insured liable to its insurers for covered losses. The third consideration was the inevitable circular litigation that would result if the indemnification agreements were not factored into the resolution of the insurance-allocation issues. "A leading commentator summarizes this situation by observing that 'an indemnity agreement between the insureds or a contract with an indemnification clause . . . may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." *Id*. at 588 (quoting *Couch on Insurance*, §219:1, at 2:19-7 (3d ed. 1999)).

The court noted case law observing that the contract between the insureds required the insurance arrangements at issue, and stated, "[I]n a suit between two insurers with identical and dueling 'other insurance' clauses, the indemnity agreement was held to be paramount." *Id*. at 590. "To hold otherwise would render the indemnity contract between the insureds completely ineffectual and would obviously not be a correct result, for it is the parties' rights and liabilities to each other which determine the insurance coverage; the insurance coverage does not define the parties' rights and liabilities one to the another [sic]." *Id*. (*Chubb Ins. Co. of Canada v. Mid-Continent Cas. Co.*, 982 F. Supp. 435, 438 (S.D. Miss. 1997)). "Whether the parties are termed 'primary' or 'excess' depends on who is required to pay first, and that is the question presented here. The answer to this question, however, depends on the indemnity agreement because of its

effect on the obligations of the parties." *Id*. "However, because the liability of an insurer is a question of contract stemming from its contractual obligation to cover its insured's liabilities, the logical first step is to determine the respective obligations of the insureds in this case under the settlement. Once that is determined, we must decide how much of the settlement amount to allocate to each party[] . . . . Only after completing these initial steps do we determine the insurers' respective obligations to cover the settlement liability." *St. Paul Fire and Marine Ins. Co. v. Am. Intern. Specialty Lines Ins. Co.*, 365 F.3d 263 (4th Cir. 2004).

Here, the trial court correctly chose to consider the parties' rights and liabilities to each other, which then lead to a determination on the coverage issue. West Bend's CGL policy should be utilized to provide coverage first. West Bend concedes that if Paragraph 4 controls, then it must provide the required coverage, because the Subcontract would be an insured contract under West Bend's policy. West Bend attempts to avoid payment of Wethington's claims by way of the Umbrella Policy by arguing that the Subcontract did not explicitly require K.B. Electric to obtain umbrella coverage.

West Bend argues that the trial court erred when it held that West Bend had a duty to defend and indemnify Wal-Mart and MacDougall against Wethington's claims pursuant to West Bend's Umbrella Policy. AI coverage under West Bend's Umbrella Policy is available only if it is required by a contract or an agreement. Because the Subcontract did not require K.B. Electric to purchase an Umbrella Policy or name MacDougall as an AI in the Umbrella Policy, K.B. Electric's contractual obligation to purchase insurance was fulfilled by purchasing the CGL policy.

West Bend also claims that the Subcontract's "flow-down" clause only applies to

24

the scope, quality, character and manner of work to be performed by K.B. Electric, and not to the insurance coverage obligations. West Bend asserts that since the Subcontract required $1,000,000 in liability insurance, and West Bend's Umbrella Policy reduces the maximum amount that it will be liable for on behalf of an AI by the amount of the underlying insurance, the result would leave $0 payable under West Bend's Umbrella Policy. West Bend contends that the trial court should have held that West Bend had no duty to defend/indemnify Wal-Mart and MacDougall under the Umbrella Policy. We disagree.

K.B. Electric was required to and did obtain umbrella coverage through West Bend. Even though the Subcontract does not explicitly state that K.B. Electric must obtain umbrella coverage, the concept of "flow-down" required K.B. Electric to undertake and assume toward MacDougall all of the obligations and responsibilities MacDougall undertook with respect to Wal-Mart and the Architect. This is so because the Subcontract expressly states that it consists not only of the Subcontract itself, but the Prime Contract and the general, supplementary, and special conditions thereof.

In further support of that conclusion, K.B. Electric's conduct reflects that it understood that the concept of "flow-down" applied not only to the scope of work, but also to its insurance obligations. The Prime Contract required MacDougall to obtain $5,000,000 in umbrella coverage. Although not explicitly required to do so by the terms of the Subcontract, K.B. Electric obtained from West Bend $6,000,000 in umbrella coverage. The umbrella coverage permitted West Bend to subtract the amount of any underlying insurance from the umbrella coverage limits. K.B. Electric's CGL policy had $1,000,000 limits. Thus, K.B. Electric had $5,000,000 in available umbrella policy

25

coverage, which was consistent with MacDougall's obligations under the Prime Contract.

We conclude that the trial court correctly granted summary judgment in favor of Amerisure and MacDougall. The parties' rights and liabilities to each other were outlined contractually by the terms of indemnification. Once that determination was made, then the insurance coverage issues could be resolved. Thus, the trial court's decision on indemnification was not premature, but in fact, necessary to prevent the hazards of circular litigation. The Subcontract explicitly referred to the Prime Contract and other documents, incorporating their terms into the Subcontract. That K.B. Electric obtained umbrella coverage from West Bend further evinces the understanding that K.B. Electric was required to do just that. Therefore, the trial court's judgment was correct in all respects.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.