
FILED
Mar 30 2015, 10:05 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Robert D. MacGill
Michael D. Moon, Jr.
Kara M. Kapke
Matthew B. Barr
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

John C. Trimble
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re: Indiana State Fair Litigation

Polet, et al. v. Mid-America Sound, et al.
49D02-1111-CT-44823
VanDam Estate v. Mid-American Sound, et al.

49D02-1111-CT-044823-001
Urschel v. Mid-American Sound, et al.
49D02-1111-CT-044823-002
Brennon v. Mid-American Sound, et al.
49D02-1111-CT-044823-003
Porter v. Mid-American Sound, et al.
49D02-1111-CT-044823-004
Santiago Estate v. Mid-American Sound, et al.
49D02-1111-CT-044823-005
BigJohny Estate v. Mid-American Sound, et al.
49D02-1111-CT-044823-006
Vinnegar v. Mid-American Sound, et al.

March 30, 2015

Court of Appeals Case No.
*Consolidated*
49A02-1404-CT-288

Appeal from the Marion Superior Court; The Honorable Theodore M. Sosin, Judge;
49D02-1111-CT-44823

49D02-1111-CT-044823-007
Indiana Farmers v. Dave Lucas Ent., et al.
49D02-1111-CT-044823-008
Hujdich v. Live Nation Worldwide Ind.,
et al.
49D02-1111-CT-044823-009
Fireman's Fund Ins. Co. v. State of
Indiana, et al.
49D02-1111-CT-044823-010.

**May, Judge.**

[1] For many years, the Indiana State Fair Commission ("the Commission") used equipment leased from Mid-America Sound ("Mid-America") to produce outdoor concerts, including one on August 31, 2011, where a number of people were killed or injured when a stage at the Indiana State Fair collapsed. Lawsuits followed, and Mid-America asserted cross-claims or third-party claims seeking indemnification from the Commission. The Commission moved for summary judgment on the question whether it must indemnify Mid-America, arguing the indemnity provisions in their agreements were unconscionable; violated the Indiana Tort Claims Act, Ind. Code ch. 34-13-3; could not be applied retroactively; and were outside the Commission's authority. The trial court granted the Commission's motion but did not articulate the basis for its decision. As the Tort Claims Act does not apply and there are genuine issues of fact regarding the validity and enforceability of the indemnification agreement, we reverse and remand for trial.

## Facts and Procedural History[1]

[2] Mid-America provides temporary roof structures and other equipment used to produce concerts and entertainment events. The Commission operates the Indiana State Fair, and its executive director is Cindy Hoye. Since the mid-1990s, the

---

[1] We heard oral argument January 12, 2015 at the Statehouse in Indianapolis. We commend counsel on the quality of their oral advocacy.

Commission has leased equipment from Mid-America to produce concerts at the Grandstand Stage and other locations at the fairgrounds.

[3] During the last ten years of their business relationship, the Commission and Mid-America followed a standard procedure. Mid-America delivered the leased equipment to the Commission before the Fair. After the Fair, Mid-America picked up the equipment, signed about forty contracts for the rented items, and submitted the contracts to the Commission. The Commission audited each contract to ensure it reflected the parties' agreement, then paid Mid-America.

[4] Before 2003, the invoices Mid-America submitted did not include an indemnification provision, but that year the parties began using a form lease contract, which they continued to use for the next nine years. It did include indemnification provisions. During that period the parties executed over one hundred leases.

[5] Each lease consisted of a double-sided invoice and a single-sided claim voucher. The front side of the invoices identified the leased goods and the payment due. It included the delivery and return dates for the goods and the "class" of rental – in this case, "show." (App. at 541.) On the back, the invoices included "Conditions of Contract" in two sections of the document. In the "Rentals" section, the Commission agreed "to assume the entire responsibility for the defense of, and to pay, indemnify, and hold [Mid-America] harmless from and hereby releases [Mid-America] from any and all claims for damage to property or bodily injury (including loss of life) resulting from" the use of Mid-America's equipment. (*Id.* at

542.) In the "Shows" section of the same "Conditions of Contract," the Commission again agreed to "pay, indemnify, and hold harmless [Mid-America] from and hereby releases [Mid-America] from any and all claims for damage to property or bodily injury" resulting from the use of the equipment. (*Id.*) The Commission reviewed and paid each invoice.

[6] The claim vouchers that accompanied the invoices were drafted by the Commission and the Commission directed Mid-America to use them. Over the signature line for "State Fair Official" the claim voucher included the language: "I certify that the attached invoice is true and correct . . . and was in accordance with the contract." (*Id*. at 544.) The "standard protocol," (*id*. at 492), was that the claim voucher had to be executed by two officials – it was certified by a State Fair official as true and correct and in accordance with the contract, then it was approved by the executive director of the Commission.

[7] In 2009 the Commission hired a contracts officer, who worked to adopt a "sole source," (*id*. at 473), agreement that would allow the Commission to accept equipment and services from Mid-America without requiring the Commission to engage in a bidding process. In 2011, the Commission asked Mid-America to send a letter explaining the services Mid-America would provide in 2011. The Commission asked that the letter refer to the long-term working relationship between the Commission and Mid-America, and to indicate Mid-America's "satisfaction with how business has been done with [the Commission] . . . regarding payments, invoices, etc." (*Id*. at 475.) Mid-America did so, and the letter referred to the parties' prior course of dealing. The letter noted Mid-America

had always provided the Commission with lower-than-normal pricing for production services, and it was able to do so because it worked so well with the Commission's Events Services Manager, who "understands our billing and the timing and manner in which invoices are paid." (*Id*. at 481.) Because of that "long term relationship," (*id*.), Mid-America could maintain expenses at the same level or limit any increase.

[8] Also in 2011, the Commission sent Mid-America its "Standard Terms and Conditions that it provided in all contracts." (Br. of Appellee Indiana State Fair Commission (hereinafter Commission's Br.) at 5.) That document included language that Mid-America would agree to indemnify and hold harmless the Commission, but the Commission would not provide such indemnification to Mid-America. The Commission does not direct us to anything in the record indicating the parties ever entered into any agreement including those standard terms and conditions, and the record evidence is that Mid-America did not receive that document.

[9] The Commission hired Mid-America to provide equipment for the 2011 State Fair, where strong winds blew the temporary roof structure and audio equipment to the ground. After the 2011 Fair, Mid-America submitted to the Commission documents and invoices that included the same defense and indemnity provisions that had been in the lease agreements in prior years. The Fair's Director of Events signed the vouchers, certifying each was "true and correct" and "in accordance with the contract." (*E.g.*, App. at 525.) Then Hoye, the Commission's Executive Director, reviewed and executed the contracts, giving them "special scrutiny"

because of the stage collapse. (*Id*. at 503.)[2] The Commission's Chief Financial Officer audited Mid-America's invoice for the temporary roof structure, which included the defense and indemnity provisions, certifying it was true and correct and in accordance with the contract.

[10] When various plaintiffs commenced lawsuits against Mid-America and others, Mid-America asked the Commission to defend and indemnify it, but the Commission refused. Mid-America then filed third-party claims and cross-claims against the Commission. The Commission moved for and was granted summary judgment.

## Discussion and Decision

[11] We review summary judgment *de novo*, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Drawing all reasonable inferences in favor of the non-moving party, we will find summary judgment appropriate if the designated evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts

---

[2] The Commission asserts in its Statement of Facts that "[the Commission] . . . never saw the indemnity provisions on the back of the invoice." (Commission's Br. at 7.) The pages of the record to which the Commission directs us in support of that assertion are part of Hoye's deposition testimony, where she said *she* did not know the "conditions of contract even existed." (App. at 739.) That testimony does not support the statement that *the Commission* "never saw the indemnity provisions on the back of the invoice."

of the truth, or if the undisputed material facts support conflicting reasonable inferences. *Id.*

[12] The initial burden is on the summary-judgment movant to demonstrate there is no genuine issue of fact as to a determinative issue, at which point the burden shifts to the non-movant to come forward with evidence showing there is an issue for the trier of fact. *Id.* While the non-moving party has the burden on appeal of persuading us a summary judgment was erroneous, we carefully assess the trial court's decision to ensure the non-movant was not improperly denied his day in court. *Id.*

[13] Our summary judgment policies aim to protect a party's day in court. *Id.* While federal practice permits the moving party to merely show that the party carrying the burden of proof *lacks* evidence on a necessary element, we impose a more onerous burden -- to affirmatively negate an opponent's claim. *Id.* That permits summary judgment to "be precluded by as little as a non-movant's 'mere designation of a self-serving affidavit.'" *Id.* (quoting *Deuitch v. Fleming,* 746 N.E.2d 993, 1000 (Ind. Ct. App. 2001), *trans. denied*). Summary judgment is not a summary trial, and it is not appropriate just because the non-movant appears unlikely to prevail at trial. *Id.* at 1003-04. We "consciously err[] on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Id.* at 1004.

[14] No public policy prevents parties from contracting as they desire, and in Indiana, a party may contract to indemnify another for the other's own negligence. *GKN Co.*

*v. Starnes Trucking, Inc.*, 798 N.E.2d 548, 552 (Ind. Ct. App. 2003). However, such provisions are strictly construed and will not be held to provide indemnification unless it is so stated in clear and unequivocal terms. *Id.* We disfavor indemnification clauses because to obligate one party for the negligence of another is a harsh burden that a party would not lightly accept. *Id.*

### *Unconscionability and Enforceability*

### a.    *Retroactive Application*

[15] The Commission asserts indemnity agreements cannot be retroactively applied, citing *Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 759 (Ind. Ct. App. 2002) ("the date of the negligent act causing injury is the date for deciding when an indemnitee should be held responsible to defend or indemnify after a demand or claim is made"). *And see Am. States Ins. Co. v. Williams*, 151 Ind. App. 99, 105, 278 N.E.2d 295, 300 (1972) (when indemnity is the subject of an express contract, Indiana takes the broad view that parties may lawfully bind themselves to indemnify against future acts of negligence). The Commission characterizes the indemnity provision in the case before us as retroactive because the indemnity provisions were printed on an invoice, and the invoice was not provided to the Commission until after Mid-America had rendered its services and after the stage collapse. However, the Commission reviewed and signed the invoices Mid-America submitted after the state collapse, and it paid Mid-America.

[16] The designated evidence of the parties' course of dealing[3] gives rise to a genuine issue whether the application of the indemnity provision may fairly be characterized as "retroactive," and summary judgment therefore could not properly be granted on that ground. Before the stage collapse, the Commission agreed to continue the parties' longstanding course of dealing, which had for years included indemnity terms on invoices not submitted until after the Fair. That agreement before the stage collapse was confirmed by "the Commission's certifications after the Fair," (Reply Br. of Appellant (hereinafter Mid-America's Reply Br.) at 3), in the form of its audits of the invoices, its execution of them, and its certifications that the invoices were true and correct and in accordance with the contract.

[17] We find instructive *S. Ry. Co. v. Arlen Realty & Dev. Corp.*, 257 S.E.2d 841, 845 (Va. 1979). Arlen argued it was not bound by an indemnification agreement because it was not executed until after Southern's employee was injured. The trial court had found that "on many occasions for the convenience of all parties," the agreements in question were signed after the equipment had been picked up and returned. *Id.*

---

[3] We agree with numerous decisions holding whether there has been a mutual course of dealing is a question of fact. *E.g., Wagener v. Steele*, 43 S.E. 403, 404 (Ga. 1903); *and see C9 Ventures v. SVC-W., L.P.*, 136 Cal. Rptr. 3d 550, 562 (Cal. Ct. App. 2012) (whether there may be an inference of the parties' common knowledge or understanding that is based upon a prior course of dealing is a question of fact); *Olinger v. Sanders*, 92 Ind. App. 358, 174 N.E. 513, 515 (1931) (whether a deposit "was a general or special deposit, and what the intention of the parties really was, is a question of fact for the court or jury trying the case to determine, from all the evidence as to custom, course of dealing, understanding, and circumstances of the particular case under investigation").

"It was the habit and practice of [the parties] to conduct their business in this manner and was a course of conduct and business practice that both parties, by their past dealings, had approved." *Id.*

The Virginia Supreme Court held the finding that the parties, by their course of dealings, had assented to and adopted the terms of the printed form as their agreement "is fully supported by the uncontradicted evidence showing that the same forms were employed in hundreds of transactions between the parties over a period of several years preceding [employee's] injury." *Id.* Similarly, Mid-America and the Commission agreed before the Fair that they would continue their long-term working relationship, which had included more than one hundred certifications by the Commission that invoices containing the same indemnity provisions as those at issue here were "in accordance with the contract." (*E.g.*, App. at 544.) Summary judgment could not properly be granted on the ground the agreements were retroactive.

#### b. Placement of Indemnity Provision

The Commission next argues the indemnity provisions were unconscionable. The Commission characterizes the indemnification provision as something Mid-America "slipped in" in 2003, (Commission's Br. at 3), and as being "tucked into the middle of small boilerplate print on the back of the invoice," (*id.* at 4). We cannot find, as a matter of law, this indemnification provision was unconscionable. The indemnification provision is in the same size type as everything else on the "Conditions of Contract" page, (*e.g.*, App. at 542), and in the "Rentals" section it

has a heading in bold type that says "5. **Responsibility for Use – Indemnity**." (*Id.*) (emphasis in original).

[20] The Commission relies on *Maxon Corp. v. Tyler Pipe Indus., Inc.*, 497 N.E.2d 570, 577 (Ind. Ct. App. 1986), *reh'g denied, trans. denied*, where we said "[w]hen . . . the imposition of a broad indemnification clause is attempted without the express assent of the proposed indemnitor, and when that clause is placed in relative obscurity on the back of an invoice, it is unconscionable." Even though "there may have been no disparity in the bargaining positions of Tyler and Maxon," we said that "[i]mposing such a clause upon a disadvantaged party who knows not what he signs and guilefully imposing it upon a party through the unilateral use of an invoice at or after the time the product is delivered" was unconscionable. *Id*. at 578.

[21] *Maxon* does not control. We note initially that the unconscionability discussion in *Maxon* was *dictum*; we determined the indemnity provision amounted to a "material alteration" and therefore never became part of the contract between Tyler and Maxon: "[b]ecause the indemnification clause in the invoice was, as a matter of law, a material alteration, it did not, as a matter of law, become a part of the contract." *Id*. at 575.

[22] *Maxon* is also factually distinguishable. There, as here, the indemnity provision was on the back of an invoice. But in *Maxon* the provision "BY ACCEPTANCE OF THE GOODS, BUYER AGREES TO INDEMNIFY SELLER AGAINST ALL LIABILITY, LOSS, COST AND EXPENSE ARISING OUT OF ANY

CLAIM OF ANY NATURE" was inserted deep in a lengthy passage with the heading "WARNING AND COVENANTS." *Id*. at 572 (emphasis in original). Mid-America's "Rentals" indemnity provision was included under the heading "**Responsibility for Use -- Indemnity**." (App. at 779.) In the "Shows" section, it was included under "**Operation of Equipment**." (*Id*.)

[23] In *Maxon*, the parties had exchanged similar forms in the past, but there were no facts indicating a Tyler employee had previously read an identical invoice. *Id*. at 575-76. Here, by contrast, the record indicated a long course of dealing, which included the use for many years of invoices containing the indemnity provisions, and the Commission's review and approval of over a hundred similar invoices. We acknowledge evidence the Commission's director did not read the invoices, but the Commission had a statutory obligation with regard to its payments:

> The fiscal officer of a governmental entity may not draw a warrant or check for payment of a claim unless . . . the invoice or bill is approved by the officer or person receiving the goods and services . . . the invoice or bill is filed with the governmental entity's fiscal officer; [and] *the fiscal officer audits and certifies before payment that the invoice or bill is true and correct*.

Ind. Code § 5-11-10-1.6 (emphasis added). There was evidence of such review and certification of the many invoices the Commission paid to Mid-America. To the extent summary judgment for the Commission was premised on unconscionability, it was error.

### c.    The Commission's Agreement to the Provision

[24] Nor was the Commission entitled to summary judgment on the ground it "did not knowingly and willingly agree to indemnification." (Commission's Br. at 14.) In light of the ample evidence it reviewed, audited, approved, and paid the invoice at issue, and numerous similar invoices over the years, summary judgment on the ground the Commission was unwilling to agree to indemnification or did not know it was doing so was error.

[25] Parties may contract for indemnification, but it must be done knowingly and willingly. *Weaver v. Am. Oil Co.*, 257 Ind. 458, 465, 276 N.E.2d 144, 148 (1971). The Commission characterizes *Weaver* as holding where "a printed form prepared by one party contains hidden clauses unknown to the other party, the burden is on the party submitting the printed form to show that the other party had knowledge of the terms contained in the form." (Commission's Br. at 15.) The Commission asserts Mid-America therefore was required to show it explained the indemnity provisions to the Commission. Under the facts of this case, we decline to hold Mid-America had any such obligation.

[26] *Weaver* does say "[t]he party seeking to enforce such a contract has the burden of showing that the provisions were explained to the other party and came to his knowledge and there was in fact a real and voluntary meeting of the minds and not merely an objective meeting." 257 Ind. at 464, 276 N.E.2d at 148. But the Commission does not acknowledge the language that precedes that statement:

> When a party can show that the contract, which is sought to be
> enforced, was in fact an unconscionable one, due to a prodigious

> amount of bargaining power on behalf of the stronger party, which is used to the stronger party's advantage and is unknown to the lesser party, causing a great hardship and risk on the lesser party, the contract provision, or the contract as a whole, if the provision is not separable, should not be enforceable on the grounds that the provision is contrary to public policy.

*Id.* at 464, 276 N.E.2d at 148 (emphasis added). As it appears both parties before us were sophisticated and held relatively equal bargaining power, *Weaver* does not control. At the very least, there are factual issues whether the State Fair Commission was, in this transaction, a "lesser party" over which Mid-America wielded "a prodigious amount of bargaining power."

[27] Finally, the Commission asserts it did not knowingly and willingly agree to indemnify Mid-America because 1) the invoice in question was not signed, and 2) the "Sole Source" letter does not reflect an indemnification agreement.

[28] As for the fact the invoice was not signed, the Commission offers no authority to the effect that alone invalidates any agreement the parties had, nor does it explicitly so argue. It does, however, argue its signature on the Commission's internal claim voucher authorizing payment for the invoice does *not* create an indemnity contract because it does not indicate the Commission assented to the indemnification terms on the invoice itself. As there was ample evidence from which an inference of the Commission's assent could be drawn, summary judgment on that ground was error.

[29] The Commission appears to argue it signed the claim voucher only because it was required to by statute, *see* Ind. Code § 5-11-10-1.6 (fiscal officer of a governmental entity may not draw a warrant or check for payment of a claim unless the invoice

or bill is approved by the officer or person receiving the goods and services), and its signature did not mean it agreed to the boilerplate indemnity language on the invoice. But the language on the claim vouchers reflected exactly that agreement. The claim vouchers did more than just authorize payment – they explicitly established the invoices were in accordance with the contract, and were true and correct. And as noted above, the "Sole Source" letter memorializes the parties' prior course of dealing, which included over a hundred identical indemnification agreements. To the extent summary judgment for the Commission was based on the premise it was not aware of or did not willingly assent to the indemnification provision, it was error.

### *Whether the Terms of the Invoice Require Indemnification*

[30] The Commission argues Mid-America has no right to indemnification even according to the terms of the contract, pointing to evidence the use of Mid-America's load bearing roof was not for a "rental" but was instead for a "show." As noted above, the invoice at issue in this case had two sections, "Rentals" and "Shows," each with an indemnity section. Under the column "class" on the invoice, the word "show" is entered. (App. at 778.)

[31] The "Rental" section of the invoice generally addresses the use of Mid-America's equipment by the lessee, here the Commission, while the "Shows" section addresses use of the equipment by Mid-America or under Mid-America's supervision. Mid-America argues the "rental" section applies because the Commission used Mid-America's equipment. The "Shows" section independently applies, Mid-America says, because the Commission and the performers'

employees operated the equipment, including the load-bearing roof, but with Mid-America's authorization, which authorization was premised on the Commission's agreement not to use the roof in high winds.

[32] The Commission asserts the "Shows" provision cannot apply because "such indemnification applies *only* to injuries arising from the use of 'equipment,' and *not* to injuries arising from the load-bearing roof." (Commission's Br. at 25.) It does not offer a citation to anything in the record to support its apparent premise that the roof was not considered part of the "equipment" the Commission leased from Mid-America. Rather, it notes Mid-America could authorize others to use its equipment, but it asserts "unlike other equipment, Mid-America has '*absolute control*' of the Load Bearing Roof, and no provision exists allowing Mid-America to transfer control of the Load Bearing Roof to anyone else."[4] (*Id*.) (emphasis in original).

[33] As there was evidence the Commission and the performers' representatives "operated the equipment, including the Load Bearing Roof," (Mid-America's Reply Br. at 11), we decline to hold the Commission was entitled to summary

---

[4] Mid-America's control over the roof was not so "absolute" as the Commission characterizes it. The language of the "Shows" provision is that Mid-America had "absolute control" of "height, loading, banners, backdrops, and all actions regarding operation of the roof . . . *regarding inclement weather*." (App. at 779.)

judgment on the premise the invoice was for a "show" only[5] and the language in the "Shows" part of the invoice cannot be applied.

### *The Commission's Authority to Indemnify*

[34] Even if there was a valid indemnity agreement, the Commission argues, it cannot be enforced because the Commission, as a government entity, cannot enter into such an agreement. It relies on the Indiana Tort Claims Act (ITCA) and the Appropriations Clause of the Indiana Constitution.

[35] The ITCA does not apply. Like any statute in derogation of the common law, the ITCA must be strictly construed against limitations on a claimant's right to bring suit. *City of Indianapolis v. Buschman*, 988 N.E.2d 791, 794 (Ind. 2013). The ITCA "applies only to a claim or suit in tort," Ind. Code § 34-13-3-1, and this is a dispute over a contract provision, not a tort claim.[6]

[36] The Commission argues the ITCA applies to this contract action because the indemnity clause is in fact "a means of shifting tort liability to Indiana taxpayers,"

---

[5] The Commission correctly notes testimony by Mid-America's president that "this was a show invoice," (App. at 762), but the Commission does not acknowledge that immediately afterward, when asked "So it's not a rental invoice; it's a show invoice," (*id.* at 1452), he said, "No. I believe it's still a rental too." (*Id.*) Summary judgment therefore cannot be premised on the statement "this was a show invoice."

[6] As summary judgment in this contract dispute was error to the extent it was premised on application of the tort claims act, we need not address whether the Commission was a governmental entity to which the act might apply. Nor do we address its argument it has no "authority to agree to *excess tort liability*." (Commission's Br. at 36.)

(Commission's Br. at 27), and only the legislature "decides the terms of potential taxpayer exposure to civil damages suits."[7]  The Commission notes the basic purpose of an indemnity clause is to shift from the indemnitee to the indemnitor the financial responsibility to pay damages, citing *Mead Johnson & Co. v. Kenco Grp., Inc.*, 899 N.E.2d 1, 3 (Ind. Ct. App. 2009).  Still, in that decision we analyzed the dispute over an indemnity clause as a contract action and noted if the words of an indemnity clause are clear and unambiguous, they are to be given their plain and ordinary meaning.  *Id.*  We have held a party "may not restyle a breach-of-contract claim as a tort claim simply to obtain additional damages," *JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC*, 977 N.E.2d 354, 364 (Ind. Ct. App. 2012), and we decline the Commission's invitation to permit it to restyle this breach-of-contract claim as a tort claim simply to avoid a contractual obligation.

[37] In a decision addressing limitations, the Southern District of Indiana rejected, in *Lilly Indus., Inc. v. Health-Chem Corp.*, 974 F. Supp. 702, 710 (S.D. Ind. 1997), reasoning similar to that the Commission offers:  "Health-Chem argues briefly that the substance of this [indemnification] count is a claim for damage to real property.

---

[7] The Commission also argues at some length that a document it refers to as the "Professional Services Contract Manual," (Commission's Br. at 28), prohibits state entities from entering into indemnification agreements.  That manual does not appear to be in the record before us, and a web address to which the State directs us returns this result:  "Error - Page Not Found. The Indiana Department of Administration has made major improvements to our site!" http://www.in.gov/ai/errors/idoa_404.html (last visited January 2, 2015).  We are therefore unable to address that argument.

However, the source of the duty allegedly breached here was the written contract, and that makes this a claim for breach of a written contract."

[38] The legislature has explicitly granted the Commission broad authority to enter into contracts: "The commission may . . . [e]nter into contracts related to the commission's powers and duties under this article." Ind. Code § 15-13-3-4.

> It seems to be well settled that the state in all its contracts and dealing must be adjudged and abide by the rules which govern in determining the right of private citizens contracting and dealing with each other. There is not one law for the state, and another for its subjects. When the state engages in business and business enterprises, and enters into contracts with individuals, the rights and obligations of the contracting parties must be adjusted upon the same principles as if both contracting parties were private persons. Both stand upon equality before the law.

State v. Feigel, 204 Ind. 438, 178 N.E. 435, 437 (1931).

[39] The record before us does not reflect the Commission's enabling statute or its own rules concerning contracts prohibit indemnification agreements, and it is clear the legislature knows how to limit or proscribe indemnity provisions when it wants to do so. See, e.g., Ind. Code § 8-2.1-26-5 (prohibiting indemnification agreements in motor carrier transportation contracts with regulated public utilities), and Ind. Code § 13-23-13-10 (prohibiting indemnification agreements in agreements by owners or operators of underground storage tanks who are liable to the state for the costs of corrective action).

# Conclusion

[40] There are genuine issues of fact regarding the validity and enforceability of the indemnification provisions in the vouchers Mid-America submitted to the Commission and the Commission reviewed and paid, and the Commission is not shielded by the ITCA. Summary judgment for the Commission was therefore error, and we accordingly reverse and remand for trial.

[41] Reversed and remanded.

Friedlander, J., concurs. Vaidik, C.J., dissents with separate opinion.

| | |
|---|---|
| In re: Indiana State Fair Litigation | Court of Appeals Case No. |
| Polet, et al. v. Mid-America Sound,et al. 49D02-1111-CT-44823 | *Consolidated* 49A02-1404-CT-288 |
| VanDam Estate v. Mid-America Sound, et al. 49D02-1111-CT-044823-001 | |
| Urschel v. Mid-America Sound, et al. 49D02-1111-CT-044823-002 | |
| Brennon v. Mid-America Sound, et al. 49D02-1111-CT-044823-003 | |
| Porter v. Mid-America Sound, et al. 49D02-1111-CT-044823-004 | |
| Santiago Estate v Mid-America Sound, et al. 49D02-1111-CT-044823-005 | |
| BigJohny Estate v. Mid-America Sound, et al. 49D02-1111-CT-044823-006 | |
| Vinnegar v. Mid-America Sound, et al. 49D02-1111-CT-044823-007 | |
| Indiana Farmers v. Dave Lucas Ent., et al. 49D02-1111-CT-044823-008 | |
| Hujdich v. Live Nation Worldwide Inc., et al. 49D02-1111-CT-044823-009 | |
| Fireman's Fund Ins. Co. v. State of Indiana, et al. 49D02-1111-CT-044823-010 | |

**Vaidik, Chief Judge, dissenting.**

[42] Mid-America was sued in tort by individuals claiming they were injured by Mid-America's negligent acts and omissions, which led to the tragic stage-roof collapse at the 2011 Indiana State Fair. Mid-America's position is that this is a contract matter: they allege that the Indiana State Fair Commission (the Commission) agreed to indemnify Mid-America in "contracts" between the parties from 2003 onward.[8] The majority reverses the trial court's grant of summary judgment in favor of the Commission, finding that there are genuine issues of material fact as to the validity and enforceability of the indemnification clauses. Given that the purported indemnification clauses were located on the backside of unsigned invoices, I have serious doubts as to whether there was an enforceable contract between Mid-America and the Commission. But I respectfully dissent from the majority's opinion because, taking substance over form, I believe that this case is nothing more than Mid-America's attempt to shift tort liability to the Commission—a tort in contract's clothing, if you will. I would find that the Commission has immunity from Mid-America's claims against them since this is the type of action contemplated by the Indiana Tort Claims Act (ITCA) and the Commission is a governmental entity.

---

[8] Specifically, in their third-party complaint for indemnification, Mid-America asserted as follows:

> [] Pursuant to Rule 14 of the Indiana Trial Rules, Mid-America, as third-party claimant, brings this claim against the State Fair Commission to protect and secure its rights to defense and indemnification under the contracts existing between the parties.

Appellant's App. p. 1006.

[43] Sovereign immunity developed in England as a common law doctrine founded on the substantive principle that "the king could do no wrong," and encompassing the procedural notion that the king, as a sovereign, was not subject to being sued in his own court. *State v. Rendleman*, 603 N.E.2d 1333, 1335 (Ind. 1992) (quoting *Peavler v. Monroe Cnty. Bd. Of Comm'rs*, 528 N.E.2d 40, 41 (Ind. 1988) (citing *Prosser & Keeton on Torts,* § 131 at 1033 (5th ed. 1984))). The doctrine was carried over by courts in the United States and was long recognized in Indiana. *See id*. Then, in 1972, after years of increasing restrictions to the doctrine, our Supreme Court in *Campbell v. State*, 259 Ind. 55, 283 N.E.2d 733 (1972), abolished the doctrine of sovereign immunity for the State in almost all tort cases. *Oshinski v. N. Ind. Commuter Transp. Dist.*, 843 N.E.2d 536, 543 (Ind. Ct. App. 2006). The *Campbell* Court explained that the legislature is primarily responsible for considering which instances of governmental conduct should be immunized from liability, and, in 1974, the General Assembly enacted the ITCA. *Id*.

[44] The ITCA governs tort claims against governmental entities and public employees and partially reinstated the sovereign immunity abolished by the *Campbell* Court. *Oshinski*, 843 N.E.2d at 543; *see also* Ind. Code § 34-13-3-1 et seq. Pursuant to the ITCA, governmental entities can be subjected to liability for tortious conduct unless the conduct is within an immunity granted by the ITCA. *Oshinski*, 843 N.E.2d at 543-44. The General Assembly created the ITCA in recognition of the principle that "it is the legislature, and not the courts, that is in the best position to determine the nature and extent to which governmental units in Indiana should be insulated from tort liability." *Benton v. City of Oakland City*, 721 N.E.2d 224, 232

(Ind. 1999). The legislative purpose of the ITCA was to limit the financial responsibility of the State by restricting damages in tort in order to protect the fiscal integrity of governmental bodies. *In re Train Collision at Gary, Ind. on Jan. 18, 1993*, 654 N.E.2d 1137, 1146 (Ind. Ct. App. 1995), *reh'g denied*.

[45] Most relevant to this case, the ITCA provides, "A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he act or omission of anyone other than the governmental entity or the governmental entity's employee." Ind. Code § 34-13-3-3(10). Regarding this subsection, our Supreme Court has stated that it provides immunity in certain cases wherein governmental liability could otherwise occur, "but that this immunity exists only when the alleged governmental liability is grounded upon the acts or omissions of persons other than the government employee acting within the scope of the employee's employment." *Hinshaw v. Bd. of Comm'rs of Jay Cnty.*, 611 N.E.2d 637, 640 (Ind. 1993). Although the *Hinshaw* Court construed this portion of the statute to apply to actions seeking to impose vicarious liability on governmental entities and employees by reason of conduct of third parties, it applies equally to the situation we have here, where Mid-America seeks to hold the Commission liable, not for the acts or omissions of the Commission, but for the acts or omissions of Mid-America.

[46] The ITCA specifically states that it applies only to tort claims; I would find this to be a tort claim. Treating this as a contract matter disregards Subsection 10. *See Hinshaw*, 611 N.E.2d at 638 ("[I]n construing a statute, we will presume that the legislature did not enact a useless provision."). Furthermore to allow a

government employee to enter into a contract—by course of dealing or otherwise—with the terms of that contract being that the governmental entity will assume the tort liability of another party frustrates the entire purpose of the ITCA. *See Benton*, 721 N.E.2d at 232.

[47] The bottom line is this: the legislature alone decides when State entities can and will be subject to suit. *See Oshinski*, 843 N.E.2d at 543; *see also Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 543 (2002) ("[A] State 'may prescribe the terms and conditions on which it consents to be sued.'"). Moreover, a state may not be sued in its own courts unless it has waived its sovereign immunity by expressly consenting to such suit through a clear declaration of that consent. *Oshinski*, 843 N.E.2d at 539-40 (quotation omitted). As such, the Commission could not expose itself to tort or contract liability under these facts even if it wanted to—and that is by design. Otherwise, as the Commission points out, "the legislature's critical role in protecting [S]tate funds from exposure to unlimited liability would be completely undermined." Appellee's Br. p. 36; *see also In re Train Collision*, 654 N.E.2d at 1146; *Thompson v. State*, 425 N.E.2d 167 (Ind. Ct. App. 1981) ("We conclude then that the object of the Tort Claims Act . . . is to protect the fiscal integrity of governmental entities by limiting their liability . . . for damages in tort."), *reh'g denied*. [9]

---

[9] Indeed, the General Assembly, through legislation, created a "supplemental state fair relief fund" of six million dollars above the ITCA caps to provide additional relief for the victims of the stage-collapse occurrence. *See* Ind. Code § 34-13-8-3. Not the Governor, the Attorney General, or any other employee of the State had the power to consent to state liability above the limits of the ITCA. Given this, it makes little

[48] And, although the majority did not reach this issue, it is clear that the Commission is a governmental entity. Indiana Code section 34-6-2-49 defines "governmental entity" for purposes of the ITCA as follows: "'Governmental entity[,]' for purposes of . . . IC 34-13-3, . . . means the state or a political subdivision of the state." Indiana Code section 15-13-2-1(b) provides that the Commission:

> (1) is a separate body, corporate and politic;
> (2) is not a state agency; and
> (3) performs essential governmental functions.

Although according to Section 15-13-2-1, the Commission is "a separate body, corporate and politic" and "not a state agency," it is nonetheless a "governmental entity" because it operates as an entity of the State.

[49] In support of this conclusion, one need only look to the statutes of Indiana Code section 15-13-1-1 et seq., which govern the State Fair and the Commission. Most significantly, under Section 15-13-2-1, the Commission was established by the State to "perform[] essential *governmental* functions." Ind. Code § 15-13-2-1(b)(3) (emphasis added). Five of the eight members of the Commission are appointed by the governor. Ind. Code § 15-13-2-2(a)(1). Commission vacancies are filled by individuals appointed by the governor. Ind. Code § 15-13-2-4(a). The

---

sense that a Commission employee(s) can waive tort immunity by submitting claim forms and unsigned Mid-America invoices to the Commission.

Commission is mandated to maintain, develop, and administer the fairgrounds and other property owned by the Commission "to provide for maximum use of the fairgrounds and property of the [C]ommission for the benefit of the citizens of Indiana." Ind. Code §§ 15-13-3-1, -2. The Commission holds the state fairgrounds in trust for the state, cannot dispose of any part of the fairgrounds unless authorized by statute, and cannot dispose of any real property without the governor's consent. Ind. Code §§ 15-13-4-2, -3. The fairgrounds and property of the Commission are exempt from state and local taxes, license fees, and special assessments. Ind. Code § 15-13-4-4. And at the close of a fiscal year, the Commission is required to submit an annual report setting forth a complete operating and financial statement of the preceding year to the governor, budget committee, and General Assembly. Ind. Code § 15-13-3-10.

[50] The State Fair Fund, which is administered by the Commission, is also controlled by statute. The Fund consists of, among other things, property-tax revenue and appropriations made by the General Assembly. Ind. Code § 15-13-8-3. The money in the Fund is subject to allotment under Indiana Code section 4-13-2-18, the statute governing appropriations and administration of the allotment system. Ind. Code § 15-13-8-7. And the state treasurer invests the Fund money in the same manner as other public funds may be invested. Ind. Code § 15-13-8-4. From these governing statutes it is clear that the State has significant involvement in and oversight of the Commission's fiscal affairs.

[51] Although federal law is not, of course, controlling in this matter, it is nonetheless instructive in providing guidance in our analysis of the Commission's status as a

state entity. Under federal law, the question of whether an entity is an "arm of the state" for purposes of Eleventh Amendment immunity turns largely on two factors: (1) the extent of the entity's financial autonomy from the state and (2) the "general legal status" of the entity. *Kashani v. Purdue Univ.,* 813 F.2d 843, 845-47 (7th Cir. 1987). Of the two, the entity's financial autonomy is the "most important factor." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007). In making this assessment, courts consider: (1) the extent of state funding; (2) the state's oversight and control of the entity's fiscal affairs; (3) the entity's ability to raise funds; (4) whether the entity is subject to state taxation; and (5) whether a judgment against the entity would result in an increase in its appropriations. *Id*. at 696.

[52] From the statutes governing the Commission, Indiana Code section 15-13-2-1 et seq., we know that the Commission receives state appropriations made by the General Assembly; that the Commission is required to submit an annual report to the governor, budget committee, and the General Assembly; and that the Commission administers the State Fair Fund, which consists of property-tax revenue, appropriations made by the General Assembly, interest accrued from the investment of Fund money, and certain proceeds from the operation of the fair. *See* I.C. §§ 15-13-3-10, 15-13-8-3, -7. Moreover, the Commission can issue revenue bonds, but only with the governor's consent, and only for the limited purposes of funding projects or refunding outstanding revenue bonds. *See* Ind. Code §§ 15-13-10-3, -4. As to the question of where the funds to cover tort-claim damages would come from, Mid-America in its reply brief cites Indiana Code section 15-13-2-14:

"The [C]ommission shall pay the expenses of the [C]ommission from the money of the [C]ommission, including the [State Fair] [F]und."[10] But Mid-America ignores the fact that the State Fair Fund itself relies upon state appropriations. *See* I.C. § 15-13-8-3. Therefore, it is clear that the Commission is not financially autonomous from the State.

[53] As to the second factor—the entity's "general legal status"—the federal courts "prioritize substance over form." *Peirick*, 510 F.3d at 696. Here, as discussed above, the statute establishing the Commission provides that the Commission is "a separate body, corporate and politic" and "not a state agency," but the statutes discussed above clearly support the conclusion that the Commission is a state and governmental entity. Primarily, the Commission was established to "perform essential governmental functions." I.C. § 15-13-2-1. Five of the eight members of the Commission are gubernatorial appointees. I.C. § 15-13-2-2. Moreover, the Commission serves the entire state, as its primary responsibility is to maintain, develop, and administer the fairgrounds "for the benefit of the citizens of Indiana." I.C. §§ 15-13-3-1, -2. Indeed, under Indiana Code section 15-13-4-2, the Commission holds the fairgrounds *in trust for the State*. I would conclude that the

---

[10] In its reply brief, Mid-America references a 1991 press release by the Attorney General, in which it is "opined that debts of the Commission are to be paid from the State Fair Fund and that 'there is no recourse against the state and its general fund . . . .'" Appellant's Reply Br. p. 19. This press release was drafted in response to the question of whether "[w]ith regards to quasi-state agencies," the State—which "creates these agencies as well as partially funds them"—would be obligated or liable in case of default on their part. *See* Ind. Op. Att'y Gen. No. 10 (1991).

Commission's general legal status is that of a state entity.  *See Peirick*, 510 F.3d at 696.

[54] Thus, prioritizing substance over form, I would find that the Commission is immune from Mid-America's indemnity claim under the ITCA; accordingly, I would affirm the trial court's grant of summary judgment in favor of the Commission.